**Jack D. DENTON, Plaintiff-Appellee,**

v.

**FIRST NATIONAL BANK OF WACO, TEXAS, Defendant-Appellant.**

**No. 84–1760.**

United States Court of Appeals, Fifth Circuit.

July 22, 1985.

Rehearing and Rehearing En Banc Denied Aug. 28, 1985.

---

Hughes & Luce, M. David Bryant, Jr., James D. McCarthy, Dallas, Tex., for defendant-appellant.

Vance Dunnam, W.V. Dunnam, Waco, Tex., for plaintiff-appellee.

Before BROWN, POLITZ, and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### Prologue

The issue before us in this ERISA case is whether the district court erred in ordering the trustees of a Bank's retirement plan[1] to make a lump sum payment to a long-term employee who left to work for a competing bank. The district court ordered such a lump sum payment—despite the employee's failure to pursue his administrative remedies under the Plan—after the employee's request for a lump sum payment was denied by the committee charged with approving the payment of retirement benefits. The district court ordered this payment, even though the Plan did not provide for lump sum payments as one of its regular options, because some other employees who had retired had received lump sum payments. We hold the district court erred in not applying ERISA's arbitrary and capricious legal standard to its evaluation of the Plan fiduciary's denial of lump sum benefits; accordingly, we reverse. To preserve the integrity of ERISA, we hold as a matter of law that the doctrine of exhaustion of remedies is applicable to the denial of benefits by Plan trustees. Additionally, since we believe the district court's interpretation of the evidence presented at trial to be clearly erroneous, we render judgment for the Plan.

### How it all Began

Jack Denton, long time employee of the First National Bank of Waco (Bank), brought suit for early payment of retirement benefits, which he claimed pursuant to the retirement plan for employees of the Bank. The Plan is administered by a retirement committee appointed by the Bank's Board of Directors. The Bank sponsors the Plan and is the trustee of the Plan, but the funds held by the Bank belong irrevocably to the Plan.

Denton decided to discontinue his employment with the Bank and go to work for a competing Bank. By letter he requested a single lump sum payment of his retirement benefits. The evidence at trial[2]

---

1. The Bank's Plan is intended to be a qualified pension plan. Qualification allows the employer to obtain current income tax deductions for contributions to the Plan, 26 U.S.C. § 404, allows the Plan's trust fund to be tax exempt, 26 U.S.C. § 501(a), and permits employees covered under the Plan to enjoy the favorable tax treatment given to Plan distributions, 26 U.S.C. § 402. Under qualified Plans the employee is guaranteed a certain monthly retirement income commencing at the Plan's normal retirement age and it is the employer who has the responsibility to make contributions in advance to assure the defined benefit.

2. There were actually two trials before the district court. At the first trial the Plan was never joined as a party. Only later did the parties become aware that this action was governed by ERISA. The second trial occurred after the

showed that several prior employees who had left the Bank had been paid by means of a lump sum if they had requested it. It is undisputed, however, that Denton's lump sum request was over two and one-half times larger than any other lump sum payment made under the Plan. To receive approval for a lump sum request, the Plan called for signatures from five of the eight committee members charged with administering the Plan. The evidence showed that the practice was informally to circulate a lump sum request form among committee members. Three committee members initially signed, thus agreeing to Denton's lump sum request, but one of these shortly asked that her name be removed, which was done. Denton's request never received more than three approval signatures, even though one of these signatures was from the President of the Bank who earlier had attempted to convince Denton to remain at the Bank.

Denton contends that it was the hostility of the Bank's President to his leaving the Bank which was responsible for the denial of his lump sum benefit request. However, Denton offered no evidence at trial that would explain the inconsistency between his theory of the President's hostility and the fact that the President approved Denton's lump sum request.[3] Moreover, it is undisputed that committee members spoke with actuaries for the Plan to determine the effect of a lump sum payment.[4] The actuaries recommended that such a large lump sum distribution— almost $135,000—not be made because it might impair the Plan's ability to meet the future retirement obligations of other Bank employees.[5]

---

Plan was joined. The parties stipulated that all evidence from the first trial would be admissible at the second trial.

3. *See generally* Mr. Dagley's testimony at Tr. I at 28–38. In that portion of his testimony, Mr. Dagley, after contesting repeated accusations by Mr. Denton's counsel that Bank personnel were "mad" at Denton, responded to a series of questions regarding Ms. Perkins, a committee member, as follows:

Q: Because she was mad at Jack, wasn't it?
A: No, that's not correct. I think you keep saying that. I think that's incorrect, Mr. Dunnam.
Q: I thought you said that while [sic] ago.
A: I don't think I said that.
Q: Now—
A: I think you're maligning some people who worked with Jack for 30 years, because I don't believe they were mad at Jack. I don't think they are today.

4. Actually, the committee made two inquiries of its actuaries. The first asked for the amount of money due Denton. This inquiry was made at the informal approval stage. The second inquiry asked the actuaries to determine the effect on the Plan and its ability to meet future retirement obligations if Denton's request were fulfilled. This inquiry was made at the committee's formal consideration of Denton's lump sum request. The actuaries recommended that the lump sum payment not be made because of the effect it would have on the Plan's ability to meet future obligations. The actuaries were also concerned about establishing a precedent for lump sum payments—even though such a payment was not one of the specified retirement options detailed in the Plan—since Denton was a high bank officer.

5. In computing the contributions to be made each year by the employer so as to fund the promised employee benefits, assumptions are made by actuaries as to mortality, turnover, rate of retirement, expected investment revenues, and expenses. The expected investment return reduces the employer's cost and the excess of actual earnings over the interest assumption is a gain which ultimately further reduces the employer's cost. Once deposited, of course, all contributions to a pension Plan are pooled in trust to pay benefits. The Plan does not have individual accounts for each participant and beneficiary.

There is no doubt under ERISA that the committee may "employ one or more persons to render advice with regard to any responsibility such fiduciary has under the Plan." 29 U.S.C. § 1102(c)(2). It is, of course, the duty of a committee to deny any special request which would effect the remaining participants' benefits and jeopardize the Plan's ability to make future payments. Once the committee, in formal session, was confronted with evidence that Denton's request was two and one-half times as large as any other lump sum request ever considered by the committee, and possessed actuarial advice that indicated that Denton's lump sum payment would jeopardize the future of the Plan and other participants' benefits, it was erroneous for the district court to have concluded that the committee acted in an arbitrary and capricious manner.

The district court found that the Plan was overfunded. We believe this finding to be clear-

After receiving the report of the actuaries, the committee, at a formal meeting, turned down Denton's request for a lump sum payment. The committee asked Denton to choose among the various options for payment which were specified in the Plan—a copy of which Denton, at all times, had in his possession.[6] After the committee's decision, Denton's attorney sent a letter to the Bank requesting, on behalf of his client, a meeting with the committee to explore the reasons for its denial of the lump sum request.[7] By letter the commit-

ly erroneous because the district court did not engage in the correct inquiry. The inquiry for a trial court must always be whether the trustees acted in an arbitrary and capricious manner, not what the district court would have done if it was confronting the evidence placed before the committee *de novo.* Thus, the growth of Plan assets at a time when interest rates approached 16% does not necessarily render arbitrary and capricious the Plan's long term assumption of a 5% growth rate. While this higher interest rate obviously reduces the necessary size of the employer's contribution to the Plan, it does not necessarily mean the Plan was overfunded. The court should have looked to the reasonableness of the committee's decision. This is why the exhaustion of administrative remedies is such an important part of ERISA.

6. Sections 2.3(C) and 3.1 of the Plan set out the general rules for the payment of the early retirement benefits that are relevant here. Plan Section 2.3(C) provides as follows:

(C) *Payment of Retirement Income.*
The retirement income payable in the event of early retirement will be payable on the first day of the month. The first payment will be made on the participant's early retirement date and the last payment will be the payment due next preceding the retired participant's death; except that, in the event the participant dies before he has received retirement income payments for a period of 10 years, the same monthly benefit will be paid for the remainder of such 10-year period to the beneficiary (or beneficiaries) designated by the participant, or, if no designated beneficiary is surviving, the same monthly benefit shall be payable for the remainder of such 10-year period as provided in Sections 4.2 and 4.3 hereof.
Plan Section 2.3(C). The retirement benefit payment contemplated by Plan Section 2.3 is in the form of an annuity benefit for the life of the participant, with payment guaranteed for ten years. In the case of married participants, the benefit takes the form of a joint and survivor annuity as required by 26 U.S.C. § 401(a)(11). *See* Plan Section 2.1(B).
Plan Section 3.1, which discusses "optional forms of retirement income", sets out the Plan-approved alternatives to the "normal" form of payment of early retirement benefits under Section 2.3. In relevant part, Plan Section 3.1 provides that:
3.1—OPTIONAL FORMS OF RETIREMENT INCOME

In lieu of the amount and form of retirement income payable in the event of normal retirement, early retirement, disability retirement, or termination of service, as specified in Sections 2.2, 2.3, 2.4 and 2.5(A) hereof and as subjected to the provisions of Section 2.1 hereof, *a participant, upon written request to the retirement committee and subject to the approval of the retirement committee,* may elect to receive a retirement income or benefit, commencing on a date not later than (a) his normal retirement date or (b) the first day of the month coincident with or next following the date of his actual retirement, whichever is later, of equivalent actuarial value payable in accordance with one of the following options:
*Option 1:* A retirement income of larger monthly amount, payable to the participant for his lifetime.
*Option 2:* A retirement income of modified monthly amount, payable to the participant during the joint lifetime of the participant and a joint pensioner designated by him, and following the death of either of them, ⅔ of such modified monthly amount payable to the survivor for the lifetime of the survivor.
*Option 3:* A retirement income of modified monthly amount, payable to the participant during his lifetime, and in the event that the participant predeceases his spouse, 50% of such modified monthly amount will be payable after the death of the participant to such spouse for the lifetime of the spouse.
*Option 4:* Such other amount and form of retirement payments or benefits as, in the opinion of the retirement committee, will best meet the circumstances of the participant; provided, however, that if such form is a monthly income other than a joint and survivor form of retirement payments or benefits, the monthly income payable to a participant under such form shall not be less than the monthly income payable under a payments certain to age 85 years and life thereafter form.
Plan Section 3.1 (emphasis added).

7. The Plan mentions lump sum payments in two places: in Plan Section 3.2, which addresses "lump sum payment of small [under $1750] retirement income," and in Section E of the First Supplement to the Plan. Plan Section 3.2 was drafted in accordance with Treasury Regulations which provide that amounts of less than $1750.00 may be paid in a lump sum without

tee responded that it was willing to have such an administratively prescribed meeting and asked Denton's attorney to send a list of convenient dates on which to hold the meeting over a two to three week period. Denton never responded to the committee's letter and instead, filed suit in state court, which was removed by the Bank to federal court.

Two trials were held before the district court. After the first trial, but before judgment, the district court ordered Denton to join the pension Plan as a party to his lawsuit. The parties stipulated prior to the second trial that all evidence from the first trial would be deemed admitted in the second trial. Further briefs and record supplements followed. The Plan appeals from the district court's order to pay Denton's retirement benefits in a lump sum rather than as one of the options listed in the Plan. The Plan urges that the district court erred by not evaluating the actions of the trustees under ERISA's arbitrary and capricious standard. The court also denied attorneys' fees to all parties.

### The Exhaustion Requirement

At trial Denton contended that all previous employees of the Bank who had requested lump sum benefits upon the termination of their employment had received such benefits by informal approval of the committee.[8] This argument, without more, is insufficient to sustain the trial court's judgment. Realizing this, Denton maintains that the trial court's credibility decision as to whether the Bank President was mad at him, and thus masterminded the rejection of his lump sum request, should not be disturbed upon appeal. Denton maintains that this hostility on the part of the President excuses his failing to proceed with the administrative remedies specified in the Plan. In essence, on appeal he seeks to come within an exception to the exhaustion of remedies doctrine by asserting that his pursuit of administrative remedies would have been futile since the committee was composed of the same members that earlier turned down his request. We disagree.

■ The evidence clearly showed that the committee comprised members from inside as well as outside the Bank. Pursuing his administrative remedy after the denial of benefits would have allowed the trustees to reconsider their decision on Denton's request. The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*. Accordingly, decisions of the trustees are disturbed only if they are arbitrary and capricious, not on the basis of what the district court would have done in the first instance. This is necessary to keep from turning every ERISA action, literally, into a federal case.

The logic behind the exhaustion requirement was set forth in *Amato v. Bernard*, 618 F.2d 559 (9th Cir.1980). The *Amato* court required benefit claimants to exhaust their administrative remedies prior to seeking federal court review of a benefit denial. The court based its decision on an examination of the legislative history of ERISA which clearly suggested that "Congress intended to grant authority to the courts to

---

violating the general ERISA requirements that retirement benefits be paid in a joint and survivor annuity form, unless the participant waives such a joint and survivor annuity, *see* Treas.Reg. § 1.411(a)–7(d)(4). Section E of the First Supplement was drafted to address the problem created by the presence of long-service employees' personal contributions in a plan now wholly supported by employer contributions. However, under Option 4 of Section 3.1, individuals may receive early retirement benefits in a lump sum if the committee approves.

**8.** *But cf., Morse v. Stanley*, 732 F.2d 1139, 1144 (2d Cir.1984): "Whether the Trustees had in the past granted acceleration [lump sum benefits] to employees who requested it does not mean that they donned a discretionary strait-jacket which held them bound to grant acceleration in all cases as a matter of course."

apply the exhaustion doctrine in suits arising under the Act." [9]

The *Amato* court stressed that the literal language and policies of ERISA require benefit Plans to provide administrative remedies to persons whose benefits had been denied. *See* ERISA § 503, 29 U.S.C. § 1133, 29 C.F.R. § 2560.503–1. Also important to the court was Congress' intention to grant trustees the broad managerial discretion necessary to establish and operate ERISA qualified pension Plans.[10] *See* generally ERISA §§ 401–14, 29 U.S.C. § 1101–1114.

> As the Second Circuit recently observed: Having charged trustees with the duty to implement this national policy, it follows that the equitable powers which a trustee exercises are fettered with meaningful standards, implicit in the references to "remedies, sanctions, and ready access to the federal court."
>
> Thus, a court may intervene in the administration of an employee benefit plan, but should intervene only when the trustees transgress their fiduciary duties by acting in an arbitrary and capricious manner.... This standard strikes a balance between excessive judicial intervention in the discharge of trustees' duties, on the one hand, and abdication of traditional judicial control of fiduciaries' actions, on the other....

*Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984). Thus, Congress' ERISA fiduciary framework mandates the exhaustion requirement. The Ninth Circuit fully illuminated this point when it said:

> the institution of such administrative claim-resolution procedures was apparently intended by Congress to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method claims settlement; and to minimize the cost of claims settlement for all concerned. It would certainly be anomalous if the same good reasons that presumably led Congress and the Secretary to require covered plans to provide administrative remedies for aggrieved claimants did not lead the court to see that those remedies are regularly used. Moreover, the trustees of covered benefit plans are granted broad fiduciary rights and responsibilities under ERISA, Sections 401 through 414, 29 U.S.C. §§ 1101–1114, and implementation of the exhaustion requirement will enhance their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.

*Amato v. Bernard*, 618 F.2d at 567.

Section 503 of ERISA provides, in relevant part, that:

> In accordance with regulations of the Secretary, every employee benefit Plan shall

> \*   \*   \*   \*   \*   \*

*Amato v. Bernard*, 618 F.2d at 567.

---

**9.** The *Amato* court said:

[A]ll actions under ERISA to enforce benefit rights under a covered plan or to recover benefits under the Plan, whether brought in federal or state courts, "are to be regarded as arising under the laws of the United States in similar fashion to those brought under Section 301 of the Labor-Management Relations Act of 1947." But the federal courts have long fashioned federal common law under Section 301 of the LMRA, ... and part of that law has been that where administrative remedies are available they must usually be exhausted by an aggrieved party before his section 301 complaint will be heard.... The legislative history of ERISA thus clearly suggests that Congress intended to grant authority to the courts to apply the exhaustion requirement in suits under the Act.

**10.** An understanding of ERISA's broad "fiduciary" concept is important to an understanding of the issues in this case. A Plan fiduciary is required to discharge his or her duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to such participants and beneficiaries. ERISA § 404, 29 U.S.C. § 1104. Moreover, a fiduciary must perform those duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise with a like character and with like aims." *Id.*

[2] afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. *See* 29 C.F.R. § 2560.-503-1. Pursuant to this congressional mandate, the Bank's Plan provided the following specific administrative remedies to a Plan participant who was denied his benefits:

4.11—*Appeal to Retirement Committee*

Within 90 days after receipt of a notice of denial of benefits as provided above, the claimant or his authorized representative may request, in writing, to appear before the retirement committee for a review of his claim. In conducting its review, the retirement committee shall consider any written statement or other evidence presented by the claimant or his authorized representative in support of his claim. The retirement committee shall give the claimant and his authorized representative reasonable access to all pertinent documents necessary for the preparation of his claim.

Within 60 days after the receipt by the retirement committee of a written request for review of his claim, or in the event of special circumstances which require an extension of time for processing such application for review, but no later than 120 days after receipt of such application, the retirement committee shall notify the claimant of its decision by delivery or by certified or registered mail to his last known address. The decision of the retirement committee shall be in writing and shall include the specific reasons for the decision presented in a manner calculated to be understood by the claimant and shall contain references to all relevant Plan provisions on which the

decision was based. The decision of the committee shall be final and conclusive.

There was no question that Denton was fully aware of his appeal rights from his Plan description provided to him as required by ERISA §§ 102(a)(1) and (b) and 104(b)(1), 29 U.S.C. §§ 1022(a)(1) and (b), 1024(b)(1). Further, Denton and his counsel admit that they intentionally did not seek or use the administrative remedies provided under the Plan. After the committee had denied his claim for a lump sum payment of benefits, Denton, through his counsel, sent a letter to the committee requesting "the right to appear before the retirement committee for a review" of the committee's decision "in accordance with paragraph 4.11 of the amended and restated retirement Plan." The committee invited Denton to suggest times for such a review and, simultaneously, assured him that the committee "shall make every effort possible to set a hearing time at your convenience with the committee." Denton simply chose to ignore the review process he had initiated.

■ Denton seeks to rely on the futility exception to the exhaustion requirement. The trial court accepted his claim that review by the committee would have been futile. However, we believe this finding to be clearly erroneous. The evidence does not show that the committee was hostile or bitter toward Denton. In order to convince the committee to honor his request for a lump sum payment, Denton had only to convince five of the eight committee members to support his cause. *See* Plan § 6.3. The attitudes of three of the eight committee members toward Denton and his claim were never discussed in the trial record. The attitude of the remaining five members of the committee were the subject of some discussion at trial, but that discussion is hardly helpful to Denton.[11] In these cir-

---

**11.** Of course, three of these members had informally approved the Denton request. The one who backed out and asked that her name be removed from the lump sum request form did so because she became concerned—even before consulting the actuaries—as to the effect on the Plan of a withdrawal the size of Denton's. As

the court in *Morse v. Stanley,* 732 F.2d at 1146 has observed, "[i]t is no violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes the interest of plan participants simply because it incidentally also benefits the corporation." Denton urges that the *Amato* court dealt with a situation where

cumstances, where it is clear that Denton had appeal rights, knew he had appeal rights, invoked these rights in a letter referring to the appeals provisions of the Plan, and was invited by the committee to exercise those rights at the time most convenient to him, it is impossible to find, as Denton contends, that no review process existed.

*Amato* also considered a claim that a participant had not exhausted the remedies provided by the Plan because it would have been futile to do so. In language singularly applicable to our case, *Amato* stated:

> Despite Amato's arguments to the contrary, we see no inadequacy in the administrative appeal procedures available under the terms of the pension Plan here in question to claimants whose applications for benefits have been initially denied. No claim is made that those procedures failed to comply, either in theory or in practice, with the terms of § 503 of ERISA or with the regulations laid down in 29 C.F.R. § 2560.503–1. The procedures are clearly defined in the Plan; they are simple; they are supposed to work quickly and there is no evidence that they do not; they can result in a claimant's receiving all the relief he is entitled to under the Plan; and there is no evidence that they are not accessible to aggrieved claimants in general or to Amato in particular.... Finally, the appeal procedures are not inadequate sim-

ply because they are administered by the trustees themselves, rather than some "neutral arbitrator." The internal administration of such procedures is the very thing contemplated by § 503 of ERISA....[12]

If Denton's view of exhaustion were to prevail, no plaintiff who knew how to claim "bitterness or hostility" on the part of the Plan's review committee could be compelled to submit his claim for administrative review of the denial of benefits prior to the filing of a federal lawsuit. Accordingly, benefit disputes would not only be more numerous and more often frivolous, but less defined as a result of this evasion of the congressionally mandated administrative process. We agree with *Amato* that Congress, in enacting ERISA, clearly wanted potential plaintiffs to first exhaust their administrative remedies before resorting to the federal courts.[13]

### The Appropriate Standard of Review

In an ERISA action, the trial court's role is sharply limited.

> [T]he clear weight of federal authority mandates that the trustee's determinations ... are to be upheld unless arbitrary or capricious.

*Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.,* 637 F.2d 357, 362 (5th Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981);

there was no allegation of personal bias on the part of the Plan's trustees. While this is unquestionably true, it does not refute the logic of the exhaustion of remedies doctrine. It is axiomatic that there must be more than allegations of bias, there must be proof. Such proof was not forthcoming in this case. As such, the district court's finding of hostility toward Denton, and thus the futility of the administrative process, cannot be sustained.

**12.** While the *Amato* court dismissed the employee's action and ordered that he pursue his administrative remedies prior to any judicial action, we choose not to follow that course here. This case has already been through two trials prior to this appeal. With the record fully fleshed out in a fashion similar to that which would be provided by an exhaustion of the Plan's administrative remedies, a remand, while

undoubtedly the preferred course in the usual case, is inappropriate here. We render judgment for the Plan on the basis of the fully developed record before us.

**13.** Another important facet of the exhaustion requirement is that it prevents fiduciaries from avoiding their duties under the Plan by insulating all benefit decisions in the protective mantel of federal judicial review. If fiduciaries were to find their decisions more closely supervised by an intervening federal judiciary, it is likely that they would go to court to seek instruction by declaratory relief on questions involving claims for benefits, rather than deciding those questions themselves as Congress intended. By requiring exhaustion of remedies, we strike a balance between judicial intervention and the discharge of the fiduciary's duties. *Cf. Bayles* 602 F.2d 97 at 100.

*Bayles v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97, 99 and 100 n. 3 (5th Cir.1979); *Dennard v. Richards Groups, Inc.* 681 F.2d 306 (5th Cir.1982) (Brown, J.). Such deference to the trustee's decision is absolutely necessary to ensure that Plan fiduciaries retain the primary responsibility for claims processing that Congress intended.

In reviewing a decision under the arbitrary and capricious standard, the trial court must focus on the evidence that was before the Plan committee when the final benefit determination was made. Here, the district court engaged in an effort to determine, not the rationality of the committee's action, but the manner in which the court would have resolved the issue in the light of the information presented at trial had it been administering the Plan. This is evident from the trial court's examination of the letters from the Plan's actuaries, the Wyatt Company. By those letters, the actuaries advised the committee that it would not be in the best interest of the Plan to pay Denton's early retirement benefits in a lump sum payment. The district court's inquiry should have been whether it was reasonable for the committee to have relied upon the opinion of its expert actuaries, rather than second guessing the correctness of the letters.[14]

We have defined the arbitrary and capricious standard of review in *Bayles* and *Dennard*. In *Dennard*, we held that the trial court should engage in a two step process. First, the court must determine the correct interpretation of the Plan's provisions. Second, the court must determine whether the Plan administrators acted arbitrarily or capriciously in light of the interpretation they gave the Plan in the particular instance. Here, Denton never argued that the Plan's provisions were ambiguous or that the committee had applied the pro-

visions of the Plan in contradiction to its terms. *Dennard* further developed the factors which the trial court should consider in evaluating conduct under the arbitrary and capricious standard.

In *Bayles*, we indicated certain factors to be considered in applying the arbitrary and capricious standard: (1) uniformity of construction; (2) "fair reading" and reasonableness of that reading; and (3) unanticipated costs.... Along with the determination of the "legally" correct meaning of the Plan provision in question, we also view as probative of the good faith of a trustee or administrator the following factors: (1) internal consistency of a Plan under the interpretation given by the administrators or trustees; (2) any relevant regulations formulated by appropriate administrative agencies ... and (3) factual background of the determination by a Plan and inferences of lack of good faith, if any. *The fact that a trustee's interpretation is not the correct one as determined by a district court does not establish in itself arbitrary and capricious action*, but is a factor in that determination.

(emphasis added). *Dennard v. Richard Group, Inc.*, 681 F.2d at 314 (Brown, J.). *See also, Ganze v. Dart Industries*, 741 F.2d 790 (5th Cir.1984) (Brown, J.).

■ We conclude that the trial court erred in conducting a *de novo* evaluation of the committee's actions rather than reviewing those actions under the arbitrary and capricious standard. The trial court should have focused upon the *Dennard-Bayles* criteria.

■ Further, the trial judge incorrectly seized upon Section E of the first supplement to the Plan to justify Denton's lump sum request. This is an error of law. While the trial court concluded that Section E of the Plan supports a lump sum pay-

---

14. Additionally, we find further support for our decision in Congress' Retirement Equity Act. Section 301(a) of the Act provides that any amendment to a Plan which has the effect of eliminating an optional benefit—such as a lump sum—will result in the Plan's loss of tax exempt status. This amendment effectively demolishes the trial court's finding that the Plan could be amended to remove the lump sum option available with committee approval under Section 3.1. *See* fn. 7 *supra*. The legislative history indicates that § 301(a) was intended to prohibit the very course which the district court assumed was available to the Bank.

ment to Mr. Denton, Section E only exists because the Plan allowed employee contributions in 1958 and before. ERISA does not require employee contributions. Upon adoption of the restatement of the Plan in 1976, the Plan, as required by 26 U.S.C. § 411(c)(2)(C) and ERISA § 204(c)(2)(C), 29 U.S.C. § 1054(c)(2)(C), gave contributor participants the right to receive these pre-1959 employee contributions, plus interest, in a lump sum at retirement. Most significantly, Section E applies only to employee contributions to the Plan made before, and the cash value of annuity contracts held on, December 27, 1958. It does not apply to payments of employer funded retirement benefits.

Denton presented no evidence that he had made personal contributions to the Plan before December 27, 1958. The trustees concede, of course, that had Denton been entitled to any benefits under Section E, he could have elected to receive those specific benefits in a lump sum and his benefits under Section 2.3 would have been reduced on an actuarily equivalent basis by the Section E payment.[15] Since Denton offered no such proof at trial, this issue is not before us. Any such offer of proof can, of course, be made to the Plan trustees when Denton selects a payment option under the Plan.

*Conclusion*

We are convinced that Denton does not come within the futility exception to the exhaustion of remedies doctrine. Further, we hold that the district court erred in not judging the committee's action in denying Denton's lump sum request under the arbitrary and capricious standard. Given two trials and the clear record before us, we believe it would serve no purpose to remand in order for Denton to pursue his administrative remedies. *See Offutt v. Prudential Ins. Co.*, 735 F.2d 948, 950 (5th Cir.1984). Accordingly, we reverse the district court's determination and hold in favor of the appellants. We leave intact the district court's denial of attorney's fees to both parties.[16] Denton is, of course, now free to elect one of the payment options specified in the Plan.

REVERSED and RENDERED.

---

**15.** Section E, in relevant part, provides as follows:

(E) AS THE SUPPLEMENT APPLIES TO ALL PARTICIPANTS IN THE RETIREMENT PLAN FOR EMPLOYEES OF THE FIRST NATIONAL BANK OF WACO IN EFFECT AS OF DECEMBER 27, 1958.

This Section E is applicable only to those employees who were in the active service of the Bank as of December 27, 1958, and were covered under the Retirement Plan for Employees of the First National Bank of Waco as of such date and who have participated continuously in all superseded plans since December 27, 1958, through December 31, 1975.

(1) *Benefits Upon Early Retirement or Termination of Service*

A participant to whom the provisions of the supplement are applicable may elect to receive in lieu of the benefits otherwise payable in accordance with Section 2.3 or 2.5(A) of the plan, whichever is applicable, the following:

If the participant retires early or terminates his service, he shall be entitled to a lump-sum amount equal to the sum of (i) *the partici-*

*pant's contributions* to the Retirement Plan of The First National Bank of Waco in effect *as of December 27, 1958*, accumulated at an interest rate of 2% from December 27, 1958 to January 1, 1976, and a rate of 5% thereafter, and (ii) the percentage (specified below) of the excess of the full cash value of the retirement income and/or retirement annuity policies held on behalf of such participant *as of December 27, 1958* over the amount in (i) above.

\*   \*   \*   \*   \*   \*

The Benefit upon Early Retirement or termination of service shall be the actuarial equivalent of the difference, if any, between the benefit provided under Sections 2.3 and 2.5(A) of the plan less the lump-sum calculated under this Section E, with such difference allocated in accordance with Sections 2.3 and 2.5(A) of the plan.

Plan, First Supplement, Section E at 1S–c to 1S–d (emphasis added).

**16.** Under ERISA, the award of attorney's fees is discretionary. 29 U.S.C. § 1132(g). We find no abuse of that discretion here.