Tracy McGASKEY, Plaintiff,

v.

HOSPITAL HOUSEKEEPING SYSTEMS OF HOUSTON, INC., et al., Defendants.

Civil Action No. H–95–4628.

United States District Court, S.D. Texas, Houston Division.

Oct. 17, 1996.

Annabell Reed, Attorney at Law, Houston, TX, for Tracy McGaskey.

Gerard (Jerry) Thomas Fazio, Dodge and Associates, Dallas, TX, for Hospital Housekeeping Systems of Houston, Inc., HHS of Houston, Inc.

**MEMORANDUM AND OPINION**

ROSENTHAL, District Judge.

Pending before this court is a motion to dismiss for failure to state a claim or, in the alternative, for partial summary judgment, filed by defendant Hospital Housekeeping Systems of Houston, Inc. ("HHS") against plaintiff Tracy McGaskey ("McGaskey"). Based on a careful review of the pleadings, motions, the parties' submissions, and the applicable law, this court GRANTS HHS's motion to dismiss WITH prejudice McGaskey's state law claims; and GRANTS HHS's motion to dismiss WITHOUT prejudice McGaskey's ERISA claims, for the reasons stated below.

## I. Background

On July 29, 1993, while working for HHS at St. John's Hospital in Nassau Bay, Texas, McGaskey slipped on some water and cleaning solution left on the floor of the hospital. She injured her right knee and her left wrist. That same day, McGaskey reported the accident to HHS and sought treatment at the St. John's Hospital emergency room.

On July 30, 1993, HHS referred McGaskey to Dr. Howard Siegler for treatment. Dr. Siegler, a medical services "provider" under HHS's Employee Injury Benefit Plan (the "Plan"),[1] took x-rays and an MRI and prescribed physical therapy for McGaskey. (Docket Entry No. 28, Ex. A–3). On August 18, 1993, McGaskey sought a second opinion from Dr. Thomas Greider, an orthopedic specialist recommended by Dr. Siegler. Dr. Greider diagnosed a left wrist sprain and contusion and a right knee sprain and contusion. He also prescribed physical therapy exercises for McGaskey to do at home. (Id.).

On August 30, 1993, a month after the fall, Dr. Siegler released McGaskey to return to work full-time. McGaskey still wore a knee and wrist brace. (Docket Entry No. 33, unmarked exhibit, McGaskey affidavit, p. 1). McGaskey did not return to work. Instead, McGaskey consulted with another doctor, Ian Reynolds, and obtained from him a "no-work

---

1. Article 2.15 of the Plan defines a "provider" as "any health care provider designated by the
 Company to administer medical treatment, for which payment or reimbursement is authorized

slip," which she submitted to HHS. (*Id.*, p. 2). HHS paid McGaskey's medical bills and indemnity for lost days of work until Dr. Siegler released her to return to her job on August 30, 1993. (Docket Entry No. 28, Ex. A–3). After that date, HHS terminated further Plan benefits and discharged McGaskey when she did not return to work.

HHS was a non-subscriber to the Texas Workers' Compensation Act. (Docket Entry No. 28, Ex. A, p. 2); *see* TEX.REV.CIV.STAT. ANN. art. 8308–3.23(a). HHS covered employees' occupational injuries through the Plan.[2] (*Id.*, Ex. A–1). Participation in the Plan was not voluntary; HHS selected the eligible employees. (*Id.*, Ex. A, p. 2). HHS chose the benefits and the amount and type of coverage afforded to each eligible employee. (*Id.*). When an eligible employee suffered an occupational injury, HHS informed the employee of the Plan benefits and the claim procedures to be followed. (*Id.*, Ex. A, p. 3).

HHS was the "Named Fiduciary" in the Plan. (Docket Entry No. 28, Ex. A–1, p. 15). HHS administered the Plan and reviewed all benefit claims submitted under the Plan. (*Id.*, Ex. A, p. 3; Ex. A–1, pp. 12–16). As administrator, HHS had the authority

> to adopt such rules and to take such actions as it deems necessary, desirable, or appropriate to carry out the provisions and purposes of this Plan, and shall have the authority to control and manage the operation and administration of this Plan. To achieve the purposes of this Plan, the Administrator shall have the discretionary power and authority to construe and interpret this Plan, and to make equitable adjustments for any mistakes or errors made in administration of this Plan.

(Docket Entry No. 28, Ex. A–1, p. 13).

Under the Plan, participants were required to "follow fully and completely the advice of, and/or the course of treatment prescribed by,

the Provider." (*Id.*, Ex. A–1, Plan Article 5.2, p. 9). The Plan afforded participants the opportunity to object to a provider's diagnosis or treatment, by the following procedure:

> If a Participant disagrees with the diagnosis or treatment provided by a Provider, he shall have the right to be examined at his own expense by a second physician selected by him from a panel of physicians selected by the Company. If the diagnosis or recommended treatment of the second physician differs from that of the Provider, the Participant shall be examined by a third physician, who shall be selected by the Provider and the second physician from a panel of physicians selected by the Company. The diagnosis and recommended treatment of the third physician shall be controlling. The fees of the third physician shall be shared by the Company and the Participant.

(*Id.*, Plan Article 4.4(b)).

Under the Plan, benefits terminated immediately if the participant failed to follow the directions of the Provider fully and completely; "fail[ed] to report for work immediately upon being released by the Provider (whether for full or restricted duty)"; or failed to comply with any of the Plan requirements or provisions. (Plan Article 5.3; Docket Entry No. 28, Ex. A–1, p. 9).

A participant whose request for benefits was denied had the right to receive notice of the denial in writing within ninety days.[3] (Docket Entry No. 28, Ex. A–1, p. 15). The notice had to be understandable and specific in its reason for denial, with reference to relevant Plan provisions. (*Id.*). The participant had the right to receive "information as to the steps to be taken if the person wishe[d] to submit a request for review." (*Id.*, Plan Article 6.8(a)(iv)).

A participant could appeal his or her denial of benefits by either requesting a review or submitting comments, in writing, within sixty

---

**2.** HHS funded the Plan through an insurance policy issued by Continental Casualty Insurance Company. (Docket Entry No. 28, Ex. A, p. 3; Ex. A–2). The insurance company paid all benefits under the Plan. (*Id.*). HHS paid the premiums on the insurance policy. (*Id.*).

under this Plan." (Docket Entry No. 28, Ex. A–1, p. 2).

**3.** Under "special circumstances," the administrator was given one hundred and eighty days to provide the participant with written notice; the administrator still needed, however, to give the participant written notice of the delay within the initial ninety-day time period. (Docket Entry No. 28, Ex. A–1, p. 15–16).

days of receiving notice of the denial. (Docket Entry No. 28, Ex. A–1, p. 16). The administrator was required to review the denial decision within sixty days of receiving the appeal request, or to let sixty days lapse and have the denial be affirmed automatically. (*Id.*).

On July 29, 1993, the date of her accident, McGaskey was eligible for HHS's Injured Worker Program benefits. (Docket Entry No. 28, Ex. A, p. 4).[4] Under the Plan, HHS paid McGaskey for the twenty-two (22) work days she missed until she was released to return to work, from July 29 to August 30, 1993.[5] (Docket Entry No. 28, Ex. A–3). HHS also paid McGaskey's medical bills for her emergency room treatment, her visits to Drs. Siegler and Greider, and her physical therapy.[6] (*Id.*). HHS did not pay for McGaskey's consultation with Dr. Reynolds; Dr. Reynolds was a non-provider and his treatment was not covered under the Plan. (*See* Docket Entry No. 28, Ex. A–1, p. 4).

HHS terminated McGaskey's benefits when she did not return to work on August 30, 1993, after Dr. Siegler released her for full duty. Her failure to return violated Article 5.3(e) of the Plan. (*See id.*, p. 9). McGaskey did not use the Plan's appeal process to challenge her termination of benefits. (Docket Entry No. 28, p. 6). Instead, on July 25, 1995, McGaskey sued HHS in state district court, alleging that HHS failed to inform her of the existence of the Plan and its policies and procedures. (Docket Entry No. 33, unmarked exhibit, McGaskey affida-

vit, p. 2). McGaskey also sued the Sisters of Charity of the Incarnate Word d/b/a St. John Hospital, alleging negligence, gross negligence, wrongful termination, discharge in retaliation for the pursuit of a worker's compensation claim, in violation of the Texas Workers' Compensation Act, and wrongful denial of benefits and breach of fiduciary duty, in violation of ERISA. (Docket Entry No. 21). The defendants removed to this court on September 27, 1995. (Docket Entry No. 1).

HHS now moves the court for a summary dismissal, under FED.R.CIV.P. 12(b)(6) or FED.R.CIV.P. 56, as to McGaskey's claims for: (i) wrongful termination, retaliatory discharge, and discrimination under the Texas Workers' Compensation Act; (ii) extracontractual and punitive damages; (iii) breach of the Plan's fiduciary obligation under ERISA; (iv) monetary penalties under ERISA; and (v) additional medical and disability benefits under HHS's Plan. (Docket Entry Nos. 28, 35).

## II. The Applicable Legal Standards

### A. The Legal Standard for a Motion to Dismiss

Under FED.R.CIV.P. 12(b)(6), "a claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229,

---

**4.** McGaskey was initially eligible for Injured Worker Program benefits under Articles Four and Five of the Plan, having satisfied the reporting, medical treatment, and other requirements. (Docket Entry No. 28, Ex. A–1, pp. 3–4, 9).

**5.** Article 4.7 of the Plan, Lost Time Injury; Wage Replacement, provides in part:

Until released by the Provider to return to work (whether for full or restricted duty), no injured Participant who meets all requirements for eligibility under this Plan shall be eligible for wage replacement benefits for each work day of incapacity ... The Participant shall be eligible for wage replacement benefits only until released for work by the Provider. The Participant shall be paid at 100% of his or her normal wage or salary rate for the day of the Injury. Thereafter, beginning on the eighth day of incapacity immediately following the

day of the Injury, and continuing for each succeeding week of incapacity during the Eligibility Period, wage replacement benefits shall be calculated and paid to the Participant at 80% of the Participant's Average Weekly Earnings, up to a maximum benefit paid of $500 per week ...
(Docket Entry No. 28, Ex. A–1, p. 6).

**6.** Article 4.3 of the Plan, Medical Benefits and Physical Rehabilitation, provides in part:

In the event of an Injury, the following benefits shall be paid directly to a Provider, or to the Participant as reimbursement for such expenses if already paid directly to a Provider by the Participant: (1) hospital bills, doctor and reconstructive dental bills, and prescription drugs; and (2) expenses incurred for physical rehabilitation, as recommended by a Provider.
(Docket Entry No. 28, Ex. A–1, p. 4).

2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir.1995). In a motion to dismiss, the allegations of the complaint must be accepted as true, *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972), and the complaint construed favorably to the pleader, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A complaint need not outline all the elements of a claim, but it must be possible to draw an inference that these elements exist. *Walker v. South Cent. Bell Tel. Co.*, 904 F.2d 275, 277 (5th Cir.1990).

A motion to dismiss for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6) is a valid means to raise an affirmative defense if the defense or other bar to relief clearly appears on the face of the complaint. *Garrett v. Commonwealth Mortgage Corp. of Am.*, 938 F.2d 591, 594 (5th Cir.1991); *Bush v. United States*, 823 F.2d 909, 910 (5th Cir.1987).

## B. The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. Under FED. R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Little*, 37 F.3d at 1075.

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 323–27, 106 S.Ct. at 2553–54).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513. "Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 321–23, 106 S.Ct. at 2552).

## III. ERISA Preemption

 The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, applies to any employee benefit plan established or maintained by an employer or an employee organization engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a).[7] A plan governed by ERISA must "fall[ ] outside the safe-harbor provisions established by the Department of Labor; and satisf[y] the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees."

---

7. ERISA defines an "employee welfare benefit plan" as follows:

any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for

its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment....

29 U.S.C. § 1002(1).

*Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir.1993). When the employer pays the premiums, selects the insurer, determines terms and coverage, and provides insurance to all full-time employees, the plan qualifies as an ERISA plan. *Davis v. Time Ins. Co.*, 698 F.Supp. 1317 (S.D.Miss.1988); *Meredith*, 980 F.2d at 355. It is undisputed that the HHS employee welfare benefit plan is governed by ERISA. *See* 29 U.S.C. § 1002(1).

■■■ ERISA "supersede[s] any and all State laws insofar as they may ... relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The preemption clause is broad, "designed to establish pension plan regulation as exclusively a federal concern," and has been interpreted broadly by the courts. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–39, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 138, 113 S.Ct. 580, 588, 121 L.Ed.2d 513 (1992); *Smith v. Texas Children's Hospital*, 84 F.3d 152, 155 (5th Cir.1996). As the Fifth Circuit recently stated:

> The Supreme Court has given the phrase 'relate to' a broad common-sense meaning. A state law relates to an ERISA plan in the normal sense of the phrase if it has a connection with or reference to such a plan. A state law can relate to an ERISA plan even if that law was not specifically designed to affect such plans, and even if its effect is only indirect.

*Rokohl v. Texaco, Inc.*, 77 F.3d 126, 129 (5th Cir.1996) (internal quotations omitted); *citing Shaw v. Delta Air Lines*, 463 U.S. 85, 95–99, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490 (1983); *Smith*, 84 F.3d at 155. "Thus, ERISA preempts a state law claim if (1) the claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects relations among the principal ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Smith*, 84 F.3d at 155; *citing Hubbard v. Blue Cross & Blue Shield Association*, 42 F.3d 942, 945 (5th Cir.1995).

■■■ "If a state law does not expressly concern employee benefit plans, it will still be preempted insofar as it applies to benefit plans in particular cases." *Rokohl*, 77 F.3d at 129; *citing Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enter., Inc.*, 793 F.2d 1456 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837, and *cert. denied*, 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987). If the existence of a benefit plan is a "critical factor" in establishing a state law claim, then that state law claim is preempted. *Ingersoll–Rand*, 498 U.S. at 139–40, 111 S.Ct. at 483.

Courts have interpreted ERISA to preempt state law claims for breach of contract and tortious processing of employee benefit claims, "even when the state action purported to authorize a remedy unavailable under the federal provision." *Pilot Life Ins. Co.*, 481 U.S. at 45–49, 55, 107 S.Ct. at 1552–53, 1557. In *Corcoran v. United Health Care, Inc.*, the Fifth Circuit held that ERISA preempted a state law malpractice claim brought by the beneficiary of a ERISA medical plan against the plan's utilization reviewer. 965 F.2d 1321 (5th Cir.1992). In *Ingersoll–Rand*, the Supreme Court held that ERISA preempted an employee's state law wrongful discharge claim based on the employer's alleged "desire to avoid making contributions to [the employee's] pension fund," even though the employee was not seeking pension benefits. 498 U.S. at 135–36, 139–41, 111 S.Ct. at 481, 483; *see also Anderson v. Electronic Data Sys. Corp.*, 11 F.3d 1311, 1313–14 (5th Cir.1994).

■■■ Notwithstanding its breadth, ERISA does not preempt state laws which only indirectly regulate the substantive content of employee benefit plans. For example, ERISA does not preempt state laws regulating the content of policies offered by insurance companies, *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), or state laws of general applicability which impact employee benefit plans only tenuously, remotely, or peripherally, *Shaw*, 463 U.S. at 98–100, 103 S.Ct. at 2901; *see also Rokohl*, 77 F.3d at 129. In *Shaw*, the Supreme Court

held that ERISA did not preclude a state law of general applicability, prohibiting sex discrimination, from applying to an employer's disability plan. 463 U.S. 85, 103 S.Ct. 2890.

■ This court must decide whether, "if the [plaintiff's] claims were stripped of their link to the pension plan[ ], they would cease to exist." *Rokohl,* 77 F.3d at 129. McGaskey argues that her "discrimination and wrongful discharge claim, [brought under the Texas Worker's Compensation Act], fundamentally affects her employer-employee relationship with the defendant, ... and only incidentally affects her beneficiary-administrator relationship with the plan." (Docket Entry No. 33, p. 3). McGaskey relies on *Rokohl* in arguing that her state law claims do not depend on HHS's ERISA plan. 77 F.3d at 130; (*Id.,* pp. 1–3).

In *Rokohl,* the employee brought a wrongful discharge action under the Texas Commission on Human Rights Act alleging that he was terminated because he had epilepsy, and not because he filed a claim under his employer's ERISA plan. *Id.* at 127. The Fifth Circuit found that his cause of action would have existed whether or not his employer maintained an ERISA plan. *Id.* In contrast, McGaskey does not allege that she was discharged because of her injury. Instead, she alleges that HHS wrongfully terminated her because she refused to follow Plan requirements and procedures.[8] McGaskey claims that she was terminated in retaliation for asserting her right to refuse to work and to continue to receive Plan disability benefits. McGaskey, unlike the *Rokohl* plaintiff, asserts claims that arise from and depend on the existence of the ERISA plan. *See Hook v. Morrison Milling Co.,* 38 F.3d

776 (5th Cir.1994)[9]. McGaskey's state law claims are preempted by ERISA.

The court GRANTS HHS's motion to dismiss McGaskey's state law claims for wrongful termination, retaliatory discharge, and discrimination under the Texas Workers' Compensation Act, and extracontractual and punitive damages.

## IV. Exhaustion of Administrative Remedies

■ The courts have imposed an exhaustion requirement on plaintiffs bringing ERISA suits. *Denton v. First National Bank,* 765 F.2d 1295, 1303 (5th Cir.1985). Courts have imposed this requirement to: "(1) uphold Congress's desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo.*" *Denton,* 765 F.2d at 1300; *citing Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980); *Meza v. General Battery Corp.,* 908 F.2d 1262, 1279 (5th Cir.1990); *cf. Chailland v. Brown & Root, Inc.,* 45 F.3d 947, 950 (5th Cir.1995).

Courts have applied the exhaustion requirement to suits to recover plan benefits, *Denton,* 765 F.2d at 1300, as well as to suits for an administrator's breach of fiduciary duties under ERISA, *Simmons v. Willcox,* 911 F.2d 1077, 1081 (5th Cir.1990); *citing Drinkwater v. Metro Life Ins. Co.,* 846 F.2d 821, 825 (1st Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In *Simmons,* the court rejected the argument that, in a case alleging fiduciary breach, ex-

---

8. McGaskey asserts in part:

McGaskey was set by her employer to a company retained physician following her on-the-job accident. Following a month of physical therapy, the physician released her to return to work full-time with no restrictions, even though she was still wearing a large brace on her knee ... She advised her employer ... that she cold not return to work immediately because she was medically unfit. Rather than sending [her] to another physician, or insuring that [she] received proper medical treatment under its ERISA plan, the employer terminated Ms. McGaskey.

(Docket Entry No. 33, pp. 2–3).

9. In *Hook v. Morrison Milling Co.,* the plaintiff, who fell down a staircase at work and was injured, filed a wrongful discharge and negligence action against his employer in state district court. 38 F.3d 776 (5th Cir.1994). The plaintiff, Hook, claimed he was wrongfully discharged in retaliation for filing a claim under his employer's ERISA plan. *Id.* The court held that his state law wrongful discharge claim was dependent upon the existence of the ERISA plan, and was preempted by ERISA. *Id.; citing Anderson,* 11 F.3d at 1313–14.

haustion was "a meaningless exercise, requiring the defendant-fiduciary to adjudicate the legal consequences of its own fraud and breach of contract." 911 F.2d at 1081 (internal quotations omitted). The *Simmons* court feared that, if the exhaustion requirement was waived for fiduciary breach claims, plaintiffs would recharacterize their claims for benefits as claims for breach of fiduciary duty, wholly avoid exhaustion, render the requirement "meaningless," and frustrate the policies behind the exhaustion requirement. *Id.*

■ It is undisputed that McGaskey did not exhaust her administrative remedies before bringing her ERISA claims to court. McGaskey argues that she "was never given a copy of the Plan until her counsel received a copy of same [during] discovery." (Docket Entry No. 33, p. 6). Because she did not have notice of the applicable administrative review procedures, McGaskey argues that she should not be bound by them. HHS does not controvert McGaskey's claim that she never received a copy of the Plan.

■ ERISA contains explicit disclosure requirements to allow employees to:

know[ ] exactly where [they] stand[ ] with respect to the plan—what benefits [they] may be entitled to, what circumstances may preclude [them] from obtaining benefits, what procedures [they] must follow to obtain benefits, and who are the persons to whom the management and investment of [their] plan funds have been entrusted.

H.Rep. No. 533, 93rd Cong., 2d Sess. 11, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4649; *see Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117–19, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989). An administrator who fails to comply with the disclosure requirements or an employee's request for information about an ERISA plan may be held personally liable under ERISA. 29 U.S.C. § 1132(b)–(c). Nevertheless, courts have found that "[i]t does not follow [from the disclosure provisions] that Congress intended to excuse individual claimants from exhausting their administrative remedies in those cases where they were never informed of the applicable administrative procedures." *Meza,* 908 F.2d at 1279.

Unless she can establish that the employer's failure to provide her with information about the plan "prejudiced [her] in [her] efforts to obtain benefits to which [she] is otherwise entitled," an employee must seek a remedy through an ERISA plan's administrative procedures before bringing suit in court for benefits denied or for breach of fiduciary duties. *Id.* at 1279–80.

There is no evidence in the record that McGaskey was substantially harmed by her failure to receive information about the HHS Plan and its review procedures. McGaskey is not excused from the requirement that she exhaust her administrative remedies and pursue review under the Plan before bringing her ERISA claims to this court. *See id.* at 1280.

The court dismisses McGaskey's ERISA claims against HHS, without prejudice.

## V. Conclusion

This court GRANTS HHS's motion for dismissal with prejudice of plaintiff McGaskey's state law claims; and GRANTS HHS's motion for dismissal without prejudice of McGaskey's ERISA claims.