Kevin Summers and Amy Summers,
Plaintiffs-Appellants,

v.

Touchpoint Health Plan, Inc.,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2005AP2643. Oral argument September 12, 2007.
—Decided May 28, 2008.*

2008 WI 45

(Also reported in 749 N.W.2d 182.)

ROGGENSACK, J., dissents.
ZIEGLER, J., joins.
ABRAHAMSON, C.J., and PROSSER, J., took no part.

For the defendant-respondent-petitioner there were briefs by *Robert J. Dreps, James D. Peterson, Bryan J. Cahill,* and *Godfrey & Kahn, S.C.,* Madison, and oral argument by *Robert J. Dreps.*

For the plaintiffs-appellants there was a brief by *Stephen E. Meili, University of Wisconsin Law School,* Madison; *James W. Gardner* and *Lawton & Cates, S.C.,* Madison, and oral argument by *Stephen E. Meili.*

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals,[1] reversing in part and remanding for further proceedings a judgment of the Circuit Court for Outagamie County, Judge Dee R. Dyer, presiding.

---

[1] *Summers v. Touchpoint Health Plan, Inc.,* 2006 WI App 217, 296 Wis. 2d 566, 723 N.W.2d 784.

¶ 2. Petitioner, Touchpoint Health Plan, Inc. (Touchpoint), seeks review of a published decision of the court of appeals, which reversed the circuit court's grant of summary judgment in favor of Touchpoint. The court of appeals remanded the case to the circuit court with an instruction to order the reinstatement of benefits as of the date that the benefits were terminated. The circuit court had upheld Touchpoint in its decision to terminate the health insurance benefits of Parker Summers (Parker), the minor son of Kevin and Amy Summers (the Summers), in regard to Parker's treatments for anaplastic ependymoma. This case involves this court's authority under 29 U.S.C. § 1132(a)(1)(B)-(e)(1) (2000)[2] to review claims arising from an Employee Retirement Income Security Act (ERISA) governed plan for the recovery of benefits due under such a plan, the enforcement of rights under the terms of such a plan, or the clarification of rights to future benefits under such a plan. *See Evans v. W.E.A. Ins. Trust,* 122 Wis. 2d 1, 5, 361 N.W.2d 630 (1985). The case also involves 29 U.S.C. § 1133 and 29 C.F.R. § 2560–503–1 (2002)[3].

¶ 3. There are two principal issues upon review: 1) Whether the termination decision itself, which denied the resubmitted request for benefits under an ERISA-governed plan, as well as the termination letter, were both arbitrary and capricious when, as here, the termination letter[4] allegedly did not adequately set forth the

---

[2] All references to the United States Code are to the 2000 version, as updated to the relevant dates of October to December 2002, unless otherwise noted.

[3] All references to the Code of Federal Regulations are to the 2002 version, as updated to the relevant dates of October to December 2002, unless otherwise noted.

[4] While the case law often uses the terminology "denial letter" regardless of whether the letter was in an initial denial of

reasons for the termination?; and 2) If so, what is the appropriate remedy?

¶ 4. We affirm the decision of the court of appeals. We hold that the termination decision itself was arbitrary and capricious because Touchpoint's interpretations of the plan were inconsistent. We also are satisfied that Touchpoint's decision was arbitrary and capricious because Touchpoint's termination of benefits decision was made despite the external review agency's finding that the requested treatment met the standard of care and was medically necessary, and despite the external review agency recommending approval for the treatment. We further hold that the second termination letter of December 12, 2002, was arbitrary and capricious, because it did not provide a sufficient and adequate explanation of the reasons for Touchpoint's termination of benefits. As a result, the Summers were not provided with the opportunity for a full and fair review of the termination, which is required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560–503–1.

¶ 5. Lastly, we hold that, given the inconsistent interpretations of the plan by Touchpoint, as well as the ambiguous policy provisions concerning participation in a clinical trial, the appropriate remedy for the termination of benefits in this case is the reinstatement of benefits forward from the date that the benefits were terminated.

I

¶ 6. Kevin Summers was employed by and received health benefits for his family through Kimberly Clark Corporation (Kimberly Clark). Kimberly Clark

benefits case or in a termination of benefits case, we will use the terminology "termination letter" given that we hold this was a termination of benefits case, not an initial denial of benefits case.

85

had contracted with Touchpoint, a health care maintenance organization, to administer its health benefits plan. This case involves the question of whether benefits for high-dose chemotherapy with stem-cell rescue were due under the provisions of that health benefits plan.

¶ 7. In October 2002 the Summers' son, Parker, was diagnosed as having a cancerous brain tumor known as an anaplastic ependymoma, which is a rare form of childhood cancer. Parker's doctor referred him to the University of Wisconsin Hospital for surgery to remove his tumor, which Touchpoint approved. Touchpoint paid for the surgery and follow-up care.

¶ 8. After the surgery, Parker's surgeon referred him to a pediatric oncologist, Dr. Diane Puccetti (Dr. Puccetti), for ongoing cancer treatment. Such follow-up treatment was necessary after surgery to prevent the progression of his disease and, therefore, to increase his chances of surviving. Dr. Puccetti weighed three treatment options for Parker: observation, chemotherapy with radiation, and high-dose chemotherapy with stem-cell rescue. After weighing all three options, Dr. Puccetti decided that high-dose chemotherapy with stem-cell rescue would be Parker's best option, because it had a higher cure rate than conventional chemotherapy. As a result, Dr. Puccetti sought to have Parker enrolled in a clinical trial that included this specialized chemotherapy, which a doctor at the New York University Medical School was conducting.

¶ 9. The Summers sought coverage from Touchpoint for the ongoing cancer treatment that was recommended. Touchpoint terminated coverage for such cancer treatment, because of the exclusion of experimental and investigational procedures in Kimberly Clark's plan with Touchpoint. Specifically, the plan excluded any

86

"service, supply, drug, device, treatment, or procedure" that Touchpoint's medical director determined was "the subject of an on-going Phase I or II clinical trial" or was "furnished in connection with medical or other research to determine its maximum tolerated dose, its toxicity, its safety, or its efficacy . . . ."

¶ 10. After the recommended cancer treatment was terminated,[5] the Summers took Parker to see Dr. Kelly Maloney at the Children's Hospital of Wisconsin. Dr. Maloney recommended chemotherapy and radiation as a course of treatment, which the Summers rejected because of the risks to a young child associated with radiation.

¶ 11. On November 20, 2002, the Summers requested that Touchpoint submit its termination of benefits to an independent review organization for an expedited review under the terms of Kimberly Clark's plan. On November 25, 2002, while determining that the recommended cancer treatment was within the standard of care and medically necessary, the independent review organization upheld Touchpoint's termination of benefits because it concluded that, "[b]ased on the policy language submitted, the proposed therapy meets the criteria of experimental."

¶ 12. Touchpoint's external review agency, despite upholding Touchpoint's termination of benefits, stated,

---

[5] The dissent takes issue with our determination that what occurred here was a " 'termination' of benefits, rather than acknowledging that benefits were 'denied.' " Dissent, ¶ 57. Make no mistake, when Parker's parents and his doctor were informed that what was recommended for the ongoing cancer treatment would not be allowed, that was a termination of the benefits for the follow-up treatment. Benefits had been previously provided for the cancer surgery and for follow-up care thereafter. Such benefits were then terminated.

"Although the proposed treatment would fall under the policy language as experimental/investigational, I would recommend approving the proposed therapy as it would be one of the standard approaches for three-year-old children with this disorder. ... There is no alternative with superior or proven results and is therefore, medically necessary." Furthermore, the review agency stated, "All patients with this disorder are standardly enrolled in clinical trials and all mature trials are phase II. ... [T]he standard of care for patients with this disorder is to enroll patients into the best phase II trials available that are building on the success of previous phase II trials. That is the case for this patient."

¶ 13. After learning about the results of the independent review, Dr. Puccetti suggested removing Parker from the clinical trial, but giving him the same cancer treatment. Dr. Puccetti submitted another request for the treatment's coverage that noted the treatment would now not be a part of any clinical trial. Once again, Touchpoint terminated coverage, and it issued a letter on December 12, 2002, that noted the decision. It is that letter which has become a focal point of this case.

¶ 14. Notwithstanding Touchpoint's termination of coverage, Dr. Puccetti administered the treatment to Parker. The Summers then sued Touchpoint in Outagamie County Circuit Court to attempt to gain coverage for the treatment. The circuit court granted Touchpoint's summary judgment motion, after determining that the plan unambiguously excluded coverage for any treatments that were the subject of Phase II clinical trials, and that Touchpoint's termination was reasonable, because it was not in dispute that the treatment administered was the subject of such a Phase II clinical trial. The court of appeals reversed the circuit court's decision. It held that the December 12, 2002

termination letter was arbitrary and capricious, thus violating 29 U.S.C. § 1133, and the applicable regulations promulgated under that statute's authority. As a result, the court of appeals remanded the case back to the circuit court with instructions to reinstate benefits retroactively. Touchpoint petitioned this court for a review of that decision.

## II

¶ 15. We begin with a discussion of our standards of review. We review a circuit court's grant or denial of summary judgment independently of either the circuit court or the court of appeals, applying the same methodology, but benefiting from their analyses. *AKG Real Estate, LLC v. Kosterman,* 2006 WI 106, ¶ 14, 296 Wis. 2d 1, 717 N.W.2d 835. Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). Summary judgment materials, including pleadings, depositions, answers to interrogatories, and admissions on file are viewed in the light most favorable to the nonmoving party. *Rainbow Country Rentals v. Ameritech Publ'g,* 2005 WI 153, ¶ 13, 286 Wis. 2d 170, 706 N.W.2d 95. In this case, the material facts are not in dispute, which leaves only questions of law that we review de novo. *1325 N. Van Buren, LLC v. T-3 Group, Ltd.,* 2006 WI 94, ¶ 22, 293 Wis. 2d 410, 716 N.W.2d 822.

¶ 16. The motion for summary judgment in this case also presents a question of law on how we review the termination of benefits under an ERISA-governed plan. In cases involving the termination of benefits

under an ERISA-governed plan, courts apply one of two standards of review. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). The default standard of review for the termination of benefits is de novo. *Id.* Under the de novo standard, no deference is given to the plan administrator's or fiduciary's termination of benefits. *Id.* at 113–15. However, if the plan reserves discretion to the plan administrator or fiduciary, the termination of benefits is reviewed under a discretionary standard. *Id.* at 115. Under the discretionary standard, the termination of benefits will not be reversed unless it was arbitrary and capricious. *Id.* at 113–15. Courts review the policy's language on a case by case basis to determine which standard of review applies to the termination of benefits in the particular case. *Id.*

■■■

¶ 17. The language of the policy in question here supports the application of the discretionary standard. A benefit plan may confer such discretion even in the absence of any express language to that effect. *Vander Pas v. Unum Life Ins. Co.,* 7 F. Supp. 2d 1011, 1014 (E.D. Wis. 1998) (citing *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust,* 901 F.2d 1369, 1371 (7th Cir. 1990)). In this case, however, Touchpoint's plan expressly conferred such discretion. The policy states, "Touchpoint Health Plan has the power and authority to administer, interpret and apply this Policy. Touchpoint Health Plan will decide all questions arising in connection with the Policy, and may issue any necessary rule and regulations for the purpose of administering the Policy." The policy grants Touchpoint's medical director the discretion to terminate coverage if treatments are experimental or investigational. The plan also gives Touchpoint's medical director the authority and discretion to inter-

pret the plan's language and its coverage. Because the plan conferred discretion, the appropriate issue in this case is whether Touchpoint's termination of benefits was arbitrary and capricious. *Firestone Tire & Rubber Co.,* 489 U.S. at 113–15; *see also Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 688 (7th Cir. 1992) (holding the administrator had discretion, and, therefore, the discretionary standard of review was the appropriate one to utilize, based on nearly identical language to Touchpoint's plan, when the Grainger plan stated the administrator " 'shall determine all questions arising in the administration, interpretation and operation of the Plan' " (citation omitted)). However, review under even "the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject." *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774 (7th Cir. 2003) (citation omitted). As a result, even under this deferential review, the United States Court of Appeals for the Seventh Circuit stated that "we will not uphold a termination when there is an absence of reasoning in the record to support it." *Id.* at 774–75.

### III

¶ 18. Before addressing the termination decision itself, we examine whether the failure to extend benefits under an ERISA-governed plan[6] was arbitrary and capricious here, where the termination letter allegedly does not adequately set forth the reasons for the termination. At issue here is the second termination letter of December 12, 2002. That letter, in pertinent part, stated: "The request was reviewed and it was

---

[6] Neither party has disputed that the plan in question is an ERISA-governed plan.

determined this is an exclusion of coverage as stated in your Certificate of Coverage . . . . For additional information, refer to your Certificate of Coverage under RESTRICTIONS, LIMITATIONS, AND EXCLUSIONS FOR COVERED SERVICES."

¶ 19. On review, Touchpoint claims that its second termination letter substantially complied with 29 U.S.C. § 1133. Touchpoint argues that the communication was sufficient to inform the Summers of the basis for the termination of coverage. It also argues that, evaluating all the communications with the Summers, there was enough for a meaningful review by them.

¶ 20. The Summers argue that the second termination letter was arbitrary and capricious. They claim that letter failed to provide them with a clear and precise understanding of the termination decision, in violation of ERISA's requirements. As a result, they assert that the letter was arbitrary and capricious, because it did not provide them with an adequate reason for the termination of benefits. The Summers argue that, because the second termination letter did not adequately state why coverage was terminated, and merely described the procedures that the Summers could use to challenge the termination, the Summers were not provided with the opportunity for a full and fair review of the termination, which is required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560–503–1.

¶ 21. We are satisfied that the Summers are correct that the second termination letter of December 12, 2002, was arbitrary and capricious, because it did not provide a sufficient explanation of the reasons for Touchpoint's termination of benefits. As a result, the Summers were not provided with the opportunity for a full and fair review of the termination, which is re-

quired by 29 U.S.C. § 1133 and 29 C.F.R. § 2560–503–1. The second letter violates the relevant statutes and regulations.

¶ 22. For a letter communicating an adverse benefits decision to satisfy ERISA's requirements, so that it is not arbitrary and capricious, it must provide adequate reasoning to explain the decision, so the beneficiary will have a "clear and precise understanding" of the decision. *Hackett,* 315 F.3d at 775. Bare conclusions are not a sufficient rationale, and "the regulations require that the denial letter itself contain specific reasons." *Halpin,* 962 F.2d at 693.

¶ 23. Compliance with 29 U.S.C. § 1133 requires two elements. First, every ERISA-governed employee benefits plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the *specific reasons for* such *denial,* written in a manner calculated to be understood by the participant . . . ." 29 U.S.C. § 1133(1) (emphasis added). Second, every ERISA-governed employee benefits plan also must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

¶ 24. Furthermore, the relevant Code of Federal Regulations section requires that a notification of an adverse benefits determination must contain the "*specific reason* or reasons *for the adverse determination;*" a "*[r]eference to the specific plan provisions on which the determination is based;*" a "description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right

93

to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;" *and,* for a group health plan with an experimental treatment exclusion or limit upon which an adverse benefits determination was based, *"either* an *explanation of the* scientific or *clinical judgment for the determination, applying* the terms of *the plan to the claimant's* medical *circumstances, or a statement that such explanation will be provided free* of charge *upon request."* 29 C.F.R. § 2560–503–1(g)(1) (emphasis added). A termination letter lacking the minimal requirements codified in the statutes and regulations is arbitrary and capricious. *Dade v. Sherwin-Williams Co.,* 128 F.3d 1135, 1141 (7th Cir. 1997); *see also Vander Pas,* 7 F. Supp. 2d at 1018.

¶ 25. The second termination letter was deficient in numerous regards. The letter did not meet the requirement of including a specific reason for the termination, as required by 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560–503–1(g)(1), but merely made reference to an exclusion of coverage. It did not include the required "[r]eference to the specific plan provisions on which the determination [was] based[,]" because it only referenced a broad, nonspecific segment of the policy (the Certificate of Coverage). 29 C.F.R. § 2560–503–1(g)(1)(ii). Also, because the adverse benefit determination apparently was based on an experimental treatment exclusion, the second letter was deficient given that it did not contain, as required, "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." 29 C.F.R. § 2560–503–1(g)(1)(v)(B). Applying the relevant statutes and regulations, Touchpoint's second termination letter was arbitrary and capricious.

¶ 26. Case law also supports this conclusion. The Seventh Circuit recently dealt with a case based on similar factual underpinnings in the context of an ERISA-governed employer-sponsored disability benefits plan. *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621 (7th Cir. 2005). Sentry terminated Schneider's long term disability benefits using a letter that merely referenced, but did not provide any details from, an independent medical exam report. The letter merely stated that the report held that Schneider had recovered and could return to work. *Id.* at 624. The letter stated, "As a result of this information, no further benefits are due." *Id.* The court noted that ERISA required that such notification to the claimant must provide the specific reasons behind the termination of benefits. *Id.* at 627. While acknowledging that *previous* case law had held that substantial compliance with the statutes and regulations was sufficient, the letter "was indefensible as a matter of statute, regulation and case law." *Id.* at 628 (citing *Halpin,* 962 F.2d at 690). The court noted that the letter failed to set forth the specific reasons why benefits were terminated and that it "did not identify the specific plan provision on which the denial was based . . . ." *Schneider,* 422 F.3d at 628. As a result, the court held that Schneider did not have " 'a sufficiently clear understanding of the administrator's position to permit effective review.' " *Id.* (citing *Halpin,* 962 F.2d at 690). The court determined Schneider was entitled to summary judgment on her claim that the letter violated ERISA and ordered the reinstatement of Schneider's benefits as of the date that the benefits were terminated. *Schneider,* 422 F.3d at 629–30.

¶ 27. In another case, a letter sent to a claimant informing him of the termination of his long term disability benefits was arbitrary and capricious when its

95

reasoning only stated, " 'Continued Disability not clinically supported.' " *Hackett,* 315 F.3d at 773. When the claimant appealed, the appeal's termination only contained the exact same explanation. *Id.* The court held that the "absence of reasoning in the record to support [the decision]" did not provide the needed grounds to uphold the plan's decision to terminate benefits, even under the deferential arbitrary and capricious standard of review. *Id.* at 774–75. The reasons for the termination must be clear and specific. *Id.* at 774. As in this case before us, the specificity of the letter was the main issue, and that letter was inadequate, because it lacked the details behind the termination and contained only statements of the termination decision. The court concluded that the termination of Hackett's benefits was inappropriate, because benefits cannot be terminated as "the result of arbitrary and capricious procedures . . . ." *Id.* at 776.

¶ 28. In another case, an employer violated 29 U.S.C. § 1133 by failing to give a claimant adequate notice of the reasons for the termination of his benefits using a letter similar to the one in this case. *Schleibaum v. Kmart Corp.,* 153 F.3d 496, 497 (7th Cir. 1998). Kmart's benefit administrator had informed Schleibaum that, after reviewing all the medical evidence, the administrator had found that Schleibaum was not permanently and totally disabled. *Id.* at 498. As a result, Kmart informed Schleibaum that the company would not continue to pay for his life insurance policy's premiums. *Id.* Kmart's "conclusory letter did not explain any specific reason for the finding that Mr. Schleibaum was not disabled . . . ." *Id.*

■■■

¶ 29. Touchpoint's attorney conceded at oral argument that the December 12, 2002, letter did not literally

comply with ERISA's requirements. Indeed, as he admitted, one need only compare the first termination letter with the second termination letter to see that the second letter lacked the required details about the reasons why Touchpoint denied the Summers' second claim. However, he argued that the letters must be read together. Where this argument fails is on the fact that the Summers did not merely resubmit their first request. The Summers requested coverage using a different rationale. This change in the claim's rationale is significant. Given that the Summers submitted the second claim using a different rationale, reading the two termination letters together is not sufficient to meet the required specificity. The second termination letter must stand on its own.[7]

¶ 30. The Summers based their changed rationale on their interpretation of the plan's experimental exclusion as not excluding coverage for a treatment received by a patient who is not enrolled in a Phase II clinical trial, regardless of whether such treatment is "subject to" a Phase II clinical trial. The exclusion in the Touchpoint plan for treatments that are "the subject of an on-going Phase I or II clinical trial" is ambiguous, because of the uncertainty over what triggers the exclusion for an individual who is not in a Phase I or II clinical trial, but who is receiving a treatment that is the subject of such a trial. For example, it is unclear

---

[7] This case is distinguishable from *Dade v. Sherwin-Williams Co.*, 128 F.3d 1135, 1141–42 (7th Cir. 1997), because, in *Dade,* the plaintiff never submitted his claim using a different rationale, so the series of letters in *Dade* all responded to the plaintiff's consistent rationale. *Id.* As a result, it was not inappropriate for the *Dade* court to read the letters together, unlike this case where the letters must stand on their own given the changed rationale that the Summers presented.

whether it is the treatment itself that is the subject of a Phase II trial, even if the claimant is not participating in the Phase II trial, or whether it is the claimant's receiving the treatment as a participant in the Phase II trial that triggers the exclusion. A term in an ERISA-governed benefits plan "is ambiguous if there is 'genuine (meaning, substantial) uncertainty, not resolvable by other means' in interpreting the term." *Casey v. Uddeholm Corp.,* 32 F.3d 1094, 1096 (7th Cir. 1994), citing *Harnischfeger Corp. v. Harbor Ins. Co.,* 927 F.2d 974, 976 (7th Cir. 1991). Touchpoint's experimental exclusion certainly seems to be genuinely uncertain and, as a result, ambiguous.

¶ 31. We agree with the federal courts that have held that " 'ambiguous terms in an insurance contract will be construed in favor of the insured.' " *Pitcher v. Principal Mut. Life Ins. Co.,* 93 F.3d 407, 411 (7th Cir. 1996) (citations omitted). Here, it appears appropriate to resolve the ambiguous experimental exclusion against Touchpoint, its drafter, and in favor of the Summers. Given that its experimental exclusion was ambiguous, Touchpoint's failure to address the Summers' interpretation of the exclusion made the second termination letter arbitrary and capricious.[8]

---

[8] As one law review article aptly noted, insurance companies' "wide discretion" in deciding "whether a medical technology should be considered 'experimental,' and, accordingly, denied coverage, can result in great disparity in the policies of insurers, with coverage decisions influenced not just by the medical data and clinical judgments, but also by factors such as lawsuits and public relations concerns." Natalie Regoli, *Insurance Roulette: The Experimental Treatment Exclusion & Desperate Patients,* 22 Quinnipiac L. Rev. 697, 700 (2004) (footnote omitted). As a result, the court system plays "an important role in regulating insurance contract terms because statutory regu-

¶ 32. When the Summers submitted their second application for the ongoing cancer treatment that was recommended, they proceeded under the belief that the reason Touchpoint refused their first request for such treatment was because Parker was participating in a Phase II clinical trial. Touchpoint's second termination letter does not acknowledge the Summers' changed reasoning that, because Parker was no longer participating in the clinical trial, Parker's treatments should be covered as part of his continuing course of treatment. Instead, Touchpoint simply repeated its decision to terminate coverage without giving any specific details for its decision. By only repeating its termination conclusion, and by failing to address or to respond to the Summers' changed rationale for coverage in its second termination letter, Touchpoint failed to communicate fully the specific reasons for its termination. Touchpoint erred in not addressing the Summers' policy interpretation, and should have provided the statutorily-required detailed rationale for its termination on the new grounds, regardless of the detail that the first letter had contained. The second letter simply does not provide the Summers with the required clear and precise understanding of why their second coverage request was denied, in light of their reasonable assumption about coverage for the treatment. Consequently, Touchpoint's second termination letter was arbitrary and capricious.

¶ 33. We also find Touchpoint's decision in terminating benefits to be arbitrary and capricious. At vari-

lation is often ineffective." *Id.* As in this case, "[t]he conflict between the standardized nature of an insurance contract and the attempt to incorporate provisions for unknown or changing therapies often leads to situations where the scope of coverage is in dispute." *Id.* at 701.

ous relevant times, Touchpoint was inconsistent in its position on what it would cover under the terms of the plan. This court has held that the absence of evidence that an administrator has consistently maintained an interpretation of the terms of its own plan "suggests arbitrary action on the part of the trustees[,]" and that the "Trust's interpretation of the terms of its plan . . . [was] arbitrary and capricious." *Evans,* 122 Wis. 2d at 19. Indeed, we held that "the burden is [on] the trustees to produce [such evidence]." *Id.*

¶ 34. Touchpoint has not consistently maintained its interpretation of its own plan, which suggests arbitrary action. In this case, the record reflects that Touchpoint's attorney, speaking for the plan's administrator in an attempt to justify the administrator's actions, conceded in the circuit court that "[t]here is also no dispute . . . that [the Summers] were told by Touchpoint that observation would be covered and radiation/chemotherapy treatment would be covered post surgery." Touchpoint now claims in its briefs to this court that this statement was merely a "simple mistake" by Touchpoint's attorney. In his deposition, Dr. Ronald Harms, Touchpoint's Medical Director stated that Touchpoint would have covered radiation plus chemotherapy, if requested, but later in his deposition, he stated that Touchpoint "would have covered anything that was not in a clinical trial," even though it appears undisputed that the radiation treatment protocol was part of a Phase II clinical trial.

¶ 35. As a result, Touchpoint maintained an arbitrary and capricious reading of its own experimental exclusion[9] by apparently agreeing to cover some treat-

---

[9] The dissent wishes us to uphold the plan administrator's interpretations and applications of the plan as reasonable.

ments that were subject to Phase II clinical trials, while not agreeing to cover other treatments that were subject to such clinical trials. Touchpoint's varying arguments on the treatments in question at various stages of this proceeding demonstrate the arbitrary and capricious nature of its interpretation of the experimental exclusion.

¶ 36. Another reason why we are satisfied that Touchpoint's decision was arbitrary and capricious remains the fact that Touchpoint's external review agency, while upholding Touchpoint's termination of benefits decision, actually recommended the approval of the requested treatment finding that the treatment was the standard of care and also was medically necessary. It is important to note, again, that Touchpoint's external review agency stated the proposed therapy (high-dose chemotherapy with stem-cell rescue) "would be one of the standard approaches for three-year-old children with this disorder. . . . There is no alternative with superior or proven results and is therefore, medically necessary . . . . [T]he standard of care for patients with this disorder is to enroll patients into the best phase II trials available that are building on the success of previous phase II trials." The review agency concluded as follows: "This is the best available therapy and there is no standard therapy that can be substituted."

¶ 37. For example, when a health benefits plan refused to pay benefits for gastric bypass surgery as being "not medically necessary," this court upheld the decision of the circuit court reinstating coverage, because the plan's decision was arbitrary and capricious.

Dissent, ¶ 58. That is impossible here, since the interpretations and applications were inconsistent, and, thus, they were arbitrary and capricious. Such arbitrary and capricious actions are not reasonable.

*Evans,* 122 Wis. 2d at 4. This court found that the decision was arbitrary and capricious, because it was made based on internal plan administrative procedures for claims personnel, which "were not incorporated into the plan as benefit plan amendments." *Id.* at 7. These guidelines "constituted an unauthorized alteration of the plan." *Id.* at 11. The plan administrators improperly had evaluated the claims "under the guideline standards that were not a part of the contracted-for plan . . . ." *Id.* at 12. Such an approach is analytically similar to the unwritten and changing interpretations of its own policy's experimental exclusion that Touchpoint exhibited in this case.

¶ 38. Furthermore, in *Evans,* the claims personnel were held to have acted in an arbitrary and capricious manner because, despite the plan's continued position that the treatment was not medically necessary for obesity alone without secondary illnesses as a result of the obesity, the plan's doctor had "recognized that obesity was an illness and that the surgery might well have been appropriate for the treatment of that illness." *Id.* at 10. Similarly, here, Touchpoint terminated Parker's coverage despite its admission that the requested treatment was "the standard of care" for children with anaplastic ependymoma.

¶ 39. Finally, as in the case before us, this court in *Evans* found the refusal to pay benefits to be arbitrary and capricious because the trustees of the plan "failed to present evidence that their interpretation of the terms of the plan was consistently maintained." *Id.* at 18. As we noted, the absence of such evidence "suggests arbitrary action on the part of the trustees." *Id.* at 19 (footnote omitted). In a similar manner, Touchpoint failed to present evidence of a consistent interpretation of its experimental exclusion. Accordingly, while we hold that the termination decision was embodied in an

102

arbitrary and capricious termination letter, we also hold that the termination decision itself was arbitrary and capricious. *Id.* at 16–19.

¶ 40. The Summers' attorney claimed at oral argument that the Touchpoint plan was an illusory contract, and Touchpoint's attorney argued in response that the Summers' illusory contract argument was preempted by ERISA. We need not address this contention because we have decided the case on other grounds. However, we note that it appears that a strong argument could be made favoring preemption of the Summers' illusory contract claim under ERISA. *See generally Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133 (1990).

## IV

¶ 41. As a result of our holdings that the second termination letter, as well as the termination decision itself, were arbitrary and capricious, we now address the issue of what the appropriate remedy is for those arbitrary and capricious termination actions. We note that our discussion of the ambiguous policy provisions concerning participation in a clinical trial relates to the remedy issue as well.

¶ 42. On review, Touchpoint claims that ERISA prohibits an award of extracontractual benefits, so a court may not order as a remedy for arbitrary and capricious termination actions any coverage for an experimental medical treatment that is unambiguously excluded under the plan. Touchpoint further argues that remedies for improper claim processing are limited to those remedies in 29 U.S.C. § 1132(a).[10] Touchpoint contends that the court of appeals erred by awarding a

---

[10] It is noted, however, that the available remedies under 29 U.S.C. § 1132(a) appear to be expansive and to include the

remedy that was not due under the plan, by giving substantive relief for a procedural deficiency, and by considering this a termination of benefits case, rather than an initial denial of benefits case.

¶ 43. On review, the Summers claim that, because Touchpoint terminated ongoing and previously afforded benefits, and because Touchpoint acted in an arbitrary and capricious fashion in failing to address the Summers' reasonable interpretation of the plan, they are entitled to the reinstatement of benefits forward from the date that the benefits were terminated. The Summers argue that this is a termination of benefits case, not an initial denial of benefits case, because the treatments in question began with the removal of the tumor and continued with some follow-up care.[11] They assert that the mere fact that Parker had reached a point where there was more than one possible treatment does not mean that medically necessary follow-up care was not an ongoing course of treatment. The Summers state that the surgery was premised on the idea that, once the tumor was removed, Parker would receive ongoing treatment by a specialist.

recovery of benefits due to a participant or a beneficiary under the terms of the plan, enforcement of the rights of a participant or a beneficiary under the terms of the plan, or a clarification of his or her rights to future benefits pursuant to the terms of the plan. *See* 29 U.S.C. § 1132(a)(1)(B). Clearly, the ambiguous policy provisions discussed herein relate to the benefits due under the terms of the plan at issue here.

[11] A letter from Dr. Puccetti suggests that Touchpoint paid for follow-up care on November 15, 2002, which included a "metastatic evaluation including a MRI of the total spine and a diagnostic lumbar puncture." Furthermore, an earlier letter from Dr. Puccetti indicates that Touchpoint paid for a postoperative CAT scan.

¶ 44. We hold that the appropriate remedy for Touchpoint's arbitrary and capricious termination actions is the reinstatement of benefits forward from the date that the benefits were terminated. We hold that this is a termination of benefits case, because surgery had occurred and some follow-up care already had commenced, which had been paid for by Touchpoint. We are, therefore, satisfied that the appropriate remedy is a return to the status quo prior to the arbitrary and capricious termination actions. In this case, that remedy encompasses Touchpoint paying Parker's health care providers for the services they have given to Parker forward from the date that the benefits were terminated.[12]

¶ 45. In cases of arbitrary and capricious denials of coverage, there are two remedies. *See Hackett,* 315 F.3d at 774–75. When the beneficiary has not yet undergone the treatments, the appropriate remedy is

---

[12] We note that *Wolfe v. J.C. Penney Co.,* 710 F.2d 388 (7th Cir. 1983), even if it were still good law, is distinguishable in many regards from the case before us. In *Wolfe,* a former employee applied for, but was denied, long term disability benefits from his former employer. *Id.* at 389. The employee never received the benefits he applied for, and, as a result, his case was an initial denial of benefits case and not a termination of benefits case. Accordingly, the *Wolfe* court's remand to the fiduciary, for a review of the information that the employee had presented in the federal trial court for the first time, so that the fiduciary could make a proper initial benefits determination is not applicable to a termination of benefits case. *Id.* at 394. We further note that the holding in *Wolfe* was abrogated by the United States Supreme Court in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989), where the Court established the analytical framework that was discussed in this decision's standard of review section.

for the beneficiary to be provided with a benefits application process that is not arbitrary and capricious, which may or may not result in coverage for the treatments. *Id.* at 776. When the beneficiary has undergone the treatments and then coverage is terminated, the appropriate remedy is for the beneficiary to receive the "retroactive reinstatement of benefits . . . ." *Id.* at 777.

¶ 46. In *Hackett,* a claimant was receiving long term disability benefits, because his serious psychiatric condition prevented him from performing any type of work. *Id.* at 773. After an employer-paid doctor examined Hackett, and after that doctor reviewed the previous findings of the other doctors, the employer-paid doctor found that "Hackett suffered from a personality disorder but found [that] Hackett [was] able to return to work without restriction." *Id.* at 773. As a result of this employer-paid doctor's opinion, the employer terminated Hackett's long term disability benefits. *Id.* The reason the employer gave for the termination of Hackett's benefits merely stated, "Continued Disability not clinically supported." *Id.* When Hackett appealed the decision to terminate his benefits, the plan's reviewer gave Hackett only the exact same response. *Id.* Hackett sued, and the United States Court of Appeals for the Seventh Circuit retroactively reinstated Hackett's benefits, even under the deferential arbitrary and capricious review standard, because there was an absence of appropriate reasoning in the record to support the termination of Hackett's benefits. *Id.* at 774–75. As in the case before us, the court held that the reasons for the termination of benefits were not appropriately articulated, so as to allow for a meaningful review. *Id.* at 775. The court held the termination was arbitrary and capricious as a result, and that the

appropriate remedy for such an arbitrary and capricious termination of ongoing benefits was the "retroactive reinstatement" of Hackett's benefits. *Id.* at 777. As the court stated, "Remedying the defective procedures requires a reinstatement of benefits." *Id.* at 776. The court went on to note that plans may not terminate benefits as a result of arbitrary and capricious procedures. *Id.*

¶ 47. We agree with the remedy that this court provided in a very similar case. In *Evans,* we held that the appropriate remedy for the arbitrary and capricious denial of benefits under a health benefits plan was the restoration of payment to the health care providers involved. *Evans,* 122 Wis. 2d at 4.

¶ 48. In a case similar to the case before us, where the plan administrator failed to communicate specific reasons for its termination of continuing benefits to the claimant, thus depriving him of the opportunity for a full and fair review of his benefits termination, the United States Court of Appeals for the Seventh Circuit upheld the district court's order of reinstatement of the claimant's benefits. *Halpin,* 962 F.2d at 698. The Seventh Circuit held that, in the absence of an appropriate termination letter and review process, the plan administrator "cannot be permitted to terminate benefits previously awarded." *Id.*

¶ 49. As noted previously, we hold that this is a termination of benefits case because surgery had occurred and some follow-up care had commenced, which had been paid for by Touchpoint. Benefits were terminated when the Summers proceeded with Dr. Puccetti's recommended treatment for Parker. Here, the Summers requested coverage for a treatment that is part of the standard treatment protocol for anaplastic ependymoma and that was determined upon independent

review to be medically necessary. The treatment protocol begins with the tumor's removal and continues with follow-up treatment, whether observation, and/or radiation or chemotherapy. Accordingly, Parker's chemotherapy with stem-cell rescue was a continuation of his treatment for anaplastic ependymoma. We agree with the Summers that the chemotherapy with stem-cell transplant was an ongoing treatment that was medically necessary to prevent the progression of Parker's disease and to improve his chances of survival. Given the ambiguous policy provisions concerning participation in a clinical trial, it was a reasonable expectation of the insureds, the Summers, that the follow-up treatments to the surgery were a continuing course of treatment that would be covered. As a result, because Touchpoint arbitrarily and capriciously terminated ongoing benefits, the appropriate remedy is the reinstatement of benefits forward from the date that the benefits were terminated.

¶ 50. In *Hackett,* where the termination letter was held to be arbitrary and capricious because it contained no rationale for the decision and only stated that the claimant's continued disability was "not clinically supported," the court held that the appropriate remedy for the termination of continuing benefits, following an arbitrary and capricious letter, was the retroactive reinstatement of benefits. *Hackett,* 315 F.3d at 776–77.[13] However, as the *Hackett* court noted, "nothing in this opinion should be read as expressing an

_____

[13] While we recognize that *Hackett* dealt with the termination of long term disability benefits and not health care benefits, the *Hackett* decision rested on the interpretation and application of the very same federal statutes and regulations as in this case, and, as noted previously, also dealt with the required contents of a termination letter under an ERISA-governed

opinion that . . . benefits should not [or could not] be terminated in the future." *Id.* at 777.

¶ 51. We hold that the appropriate remedy here is to remand this case to the circuit court with an instruction for that court to order the reinstatement of Parker's benefits forward from the date that the benefits were terminated.

## V

¶ 52. We affirm the decision of the court of appeals. We hold that the termination decision itself was arbitrary and capricious because Touchpoint's interpretations of the plan were inconsistent. We also are satisfied that Touchpoint's decision was arbitrary and capricious because Touchpoint's termination of benefits decision was made despite the external review agency's finding that the requested treatment met the standard of care and was medically necessary, and despite the external review agency recommending approval for the treatment. We further hold that the second termination letter of December 12, 2002, was arbitrary and capricious, because it did not provide a sufficient and adequate explanation of the reasons for Touchpoint's termination of benefits. As a result, the Summers were not provided with the opportunity for a full and fair review of the termination, which is required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560–503–1.

¶ 53. Lastly, we hold that, given the inconsistent interpretations of the plan by Touchpoint, as well as the ambiguous policy provisions concerning participation in a clinical trial, the appropriate remedy for the

benefits plan. *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 772 (7th Cir. 2003).

termination of benefits in this case is the reinstatement of benefits forward from the date that the benefits were terminated.

¶ 54. The decision of the court of appeals is affirmed, and the case is remanded to the circuit court for proceedings consistent with our decision.

*By the Court.*—Affirmed and remanded to the circuit court.

¶ 55. SHIRLEY S. ABRAHAMSON, C.J., and DAVID T. PROSSER, J., did not participate.

¶ 56. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Decisions of the United States Supreme Court on questions of federal law bind this court. *State v. Ward,* 2000 WI 3, ¶ 39, 231 Wis. 2d 723, 604 N.W.2d 517 (concluding that the decisions of the United States Supreme Court are controlling precedent on questions of federal law). However, the majority opinion contravenes *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989) and *Egelhoff v. Egelhoff,* 532 U.S. 141 (2001), binding precedent of the United States Supreme Court, in its interpretation and application of the Employment Retirement Income Security Act (ERISA)[1] to the healthcare policy at issue here. Because the majority opinion disregards binding precedent, I respectfully dissent.

¶ 57. The majority opinion does not adhere to federal law in at least three respects. First, Touchpoint Health Plan, Inc. (Touchpoint) has the power to interpret the terms of the policy and to decide whether a treatment is a covered service under the policy. Notwithstanding the express allocation of power to the plan administrator by the policy, the majority opinion con-

---

[1] 29 U.S.C. § 1001 et seq.

strues the healthcare policy itself.[2] Second, although the majority opinion recognizes that it may not reverse the plan administrator's decision unless it is arbitrary and capricious, it disregards controlling federal precedent in regard to when a decision is arbitrary and capricious.[3] Third, the majority opinion concludes that the second notice of denial of Kevin and Amy Summers' (the Summers) claim was insufficient,[4] and then it characterizes the decision of the plan administrator as a "termination" of benefits, rather than acknowledging that benefits were "denied."[5] It does so in order to have insurance coverage as a remedy for its conclusion that Touchpoint provided insufficient notice to the Summers.[6]

¶ 58. I conclude that, because Touchpoint has the power to interpret and apply the policy, we are required to uphold the plan administrator's interpretation and application of the policy if it is reasonable. *Firestone,* 489 U.S. at 111. Touchpoint decided that the treatment for which benefits were sought is defined as an "experimental" treatment in the policy and that "experimental" treatments are excluded from coverage under the policy. This is a reasonable interpretation of the policy; and therefore, it is not arbitrary and capricious. I also conclude that the notice of denial of claim substantially complied with the notice requirements of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(g). Accordingly, I would reverse the court of appeals and remand the case to the circuit court to dismiss the Summers' complaint on the merits.

---

[2] Majority op., ¶¶ 29–30.

[3] *Id.,* ¶¶ 16, 21, 33–39.

[4] *Id.,* ¶ 25.

[5] *Id.,* ¶ 48.

[6] *Id.,* ¶ 49.

## I. BACKGROUND

¶ 59. This case arises in the course of the Summers' request for payment of the expenses incurred for certain treatment their son, Parker, received. Parker suffered from an anaplastic ependymoma, a malignant brain tumor. The tumor was surgically removed, with more than $80,000 in healthcare benefits being paid for Parker's care. Subsequent to the surgery, the Summers chose to have Parker receive high-dose chemotherapy with stem-cell rescue. The Summers' claim for payment for this specialized chemotherapy is before this court on review.

¶ 60. The following statements, which are dispositive of the questions presented herein, are not disputed: (1) The Summers' healthcare policy is governed by federal ERISA law. (2) Under the healthcare policy at issue, "prior authorization" is required for healthcare services before they are rendered, unless they are emergency services. (3) "Prior authorization" is defined in the policy as "approval granted by Touchpoint Health Plan's Medical Director for anticipated services prior to those services being rendered." (4) Subsequent to Parker's surgery, the Summers sought "prior authorization" from Touchpoint for the treatment of high-dose chemotherapy with stem-cell rescue. (5) The policy grants Touchpoint the "power and authority" to interpret it. (6) Touchpoint's Medical Director reviewed the Summers' "prior authorization" request for Parker's treatment, and on November 19, 2002, he denied the request because he concluded that the treatment was "experimental," as "experimental" is defined in the policy. (7) Touchpoint's Medical Director explained that the treatment was "experimental" because the treatment was the subject of an ongoing Phase I or II clinical trial. (8) He also explained that under the policy, "experimen-

tal" treatments are not covered services. (9) He related that the Summers had a right to appeal his decision, that assistance in proceeding on an appeal was available and that the Summers had a right to an "external review" of his decision. (10) The Summers chose to pursue an external review, which was provided by the Medical Review Institute of America, Inc. (11) The Medical Review Institute decided "to uphold the prior adverse decisions." That external review decision explained:

> Based on the policy language submitted, the proposed therapy meets the criteria of experimental. Therefore, the previous denials would be upheld.

(12) After the denial of benefits was upheld by the Medical Review Institute and after Parker received the treatment, the Summers re-submitted their request for coverage for the same specialized chemotherapy treatment for Parker. (13) On December 12, 2002, the Touchpoint Health Plan Medical Director again denied coverage, stating that the specialized chemotherapy treatment was designated under the insurance policy as "an exclusion of coverage" because that treatment was defined as "experimental" under the policy due to its being part of an ongoing Phase II clinical trial.

¶ 61. As all parties agree, the policy grants Touchpoint "the power and authority to administer, interpret and apply" it. It also grants Touchpoint's Medical Director the specific power to determine whether a particular treatment for which coverage is sought is "experimental." The Policy states in relevant part:

> EXPERIMENTAL/INVESTIGATIONAL means any service, supply, drug, device, treatment, or procedure that Touchpoint Health Plan's Medical Director determines:
>
> . . . .

3. Is the subject of an on-going Phase I or II clinical trial, or furnished in connection with medical or other research to determine its maximum tolerated dose, its toxicity, its safety, or its efficacy[.]

There is no dispute by the Summers, or by the majority opinion, that the treatment at issue is the subject of an ongoing Phase I or II clinical trial.

¶ 62. The policy also defines "exclusion":

EXCLUSION means any service or supply listed in the section of this Certificate entitled Restrictions, Limitations and Exclusions. Such services or supplies listed as Exclusions are not covered by Touchpoint Health Plan, *regardless of their Medical Necessity or their approval or prescription by a physician* or other provider. (Emphasis added.)[7]

Under the policy's exclusions from coverage, the policy states:

THE FOLLOWING SERVICES ARE *NOT* COVERED BY TOUCHPOINT HEALTH PLAN:

---

[7] The majority opinion asserts that Parker's treatment was medically necessary because it falls within the standard of care for his illness and because Parker's physician ordered it. Therefore, it should be covered. Majority op., ¶ 4. While describing Parker's treatment as medically necessary engenders sympathy for the majority opinion's result, that result cannot be reached under the terms of the policy. The terms of the policy that define "exclusion" explicitly state that the standard of care and a physician's order cannot be considered by the administrator when determining whether the treatment is excluded from coverage under the policy. Therefore, the majority opinion contravenes the following primary rule of ERISA-governed plans where claims for benefits are made: the plan shall be administered in accordance with the terms of the plan documents. *Egelhoff v. Egelhoff,* 532 U.S. 141, 147 (2001).

Experimental/Investigational

1. Services, supplies, drugs, devices, treatments, or procedures that Touchpoint Health Plan determines to be Experimental or Investigational. (Emphasis in original.)

There is no dispute that Touchpoint interpreted these policy provisions in reaching its decision to deny the Summers' request for prior authorization for high-dose chemotherapy with stem-cell rescue, as well as for payment for this treatment after Parker received it. Therefore, the outcome of this case turns on the application of federal law to Touchpoint's interpretation and application of the policy.

## II. DISCUSSION

A. Standard of Review

¶ 63. This case is before us to review the appeal of a decision granting summary judgment to Touchpoint. We review the decision on a motion for summary judgment independently, applying the same methodology as the circuit court. *City of Janesville v. CC Midwest, Inc.*, 2007 WI 93, ¶ 13, 302 Wis. 2d 599, 734 N.W.2d 428 (citing *AKG Real Estate, LLC v. Kosterman*, 2006 WI 106, ¶ 14, 296 Wis. 2d 1, 717 N.W.2d 835).

¶ 64. The decision that began this lawsuit under 29 U.S.C. § 1132(a)(1)(B) was the denial of healthcare insurance coverage to the Summers for the treatment Parker received, based on Touchpoint's interpretation and application of an ERISA-regulated policy. When an ERISA healthcare policy gives the administrator the power to interpret and apply the policy, we review the

administrator's decisions under the arbitrary and capricious standard. *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 688 (7th Cir. 1992) (citing *Firestone,* 489 U.S. at 111). A decision is arbitrary and capricious only if it is not reasonable. *Firestone,* 489 U.S. at 111. Under the arbitrary and capricious standard of review, "[w]here a plan administrator has offered a reasonable interpretation of disputed provisions, [a court] may not replace it with an interpretation of [its] own." *Booth v. Wal-Mart Stores, Inc.,* 201 F.3d 335, 344 (4th Cir. 2000).

B. Touchpoint's Decision

 1. General ERISA principles

 ¶ 65. A major objective of ERISA is "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9 (1987). In furtherance of that goal, the United States Supreme Court has concluded that ERISA-governed plans must state the basis for the payment of benefits and that the administrator must administer the plan in accord with the plan's terms, and *not on any other basis. Egelhoff,* 532 U.S. at 147.

> ERISA[] commands that a plan shall "specify the basis on which payments are made to and from the plan," § 1102(b)(4), and that the fiduciary shall administer the plan "in accordance with the documents and instruments governing the plan," § 1104(a)(1)(D) . . . .

*Id.* (citation omitted). Therefore, we must examine Touchpoint's explanation for denying benefits in light of the terms of the policy, because Touchpoint was obligated to conform its decisions in regard to payment, or the denial thereof, to the healthcare policy. *Id.*

116

## 2. Policy interpretation

¶ 66. Touchpoint interpreted the policy to deter-mine whether Parker's treatment was a covered service under the policy. It denied coverage based on three factors: (1) the treatment is the subject of an ongoing Phase I or II clinical trial; (2) the policy defines such treatment as "experimental" treatment; and (3) experi-mental treatment is not a covered service within the terms of the .policy.

¶ 67. It has never been disputed that high-dose chemotherapy with stem-cell rescue is the subject of an ongoing Phase I or II clinical trial. Therefore, the only issue for our review is whether Touchpoint's decision that the treatment is "experimental," as that term is used in the policy, is reasonable. *Firestone,* 489 U.S. at 111.

¶ 68. The majority opinion asserts that the Sum-mers based their second request for coverage on a different theory. The majority opinion acknowledges that the treatment, itself, which Parker received, was the subject of an ongoing Phase II clinical trial.[8] How-ever, the majority opinion asserts that as of the second request for coverage, Parker was not enrolled, person-ally, in a Phase I or II clinical trial when he received the treatment that is the subject of an ongoing clinical trial.[9] Based on this difference, the majority opinion contends that the definition of "experimental" is am-biguous. It asserts:

> it is unclear whether it is the treatment itself that is the subject of a Phase II trial, even if the claimant is not participating in the Phase II trial, or whether it is the

---

[8] Majority op., ¶¶ 9, 14.

[9] *Id.,* ¶ 30.

claimant's receiving the treatment as a participant in the Phase II trial that triggers the exclusion.[10]

The majority opinion then construes the ambiguity that it has created against the insurer.[11] The majority opinion cites *Pitcher v. Principal Mutual Life Insurance Co.,* 93 F.3d 407 (7th Cir. 1996), and *Casey v. Uddeholm Corp.,* 32 F.3d 1094 (7th Cir. 1994), as support for its conclusion.[12]

¶ 69. The majority opinion's conclusion is contrary to controlling precedent. The dispositive question is not whether the policy is ambiguous, as the majority opinion implies; but rather, whether Touchpoint's interpretation of the policy is reasonable. *Firestone,* 489 U.S. at 111. It is undisputed that Touchpoint has the power to interpret the terms in the policy. When the plan administrator has the power to interpret the policy, a court cannot overturn a plan administrator's interpretation of a policy term unless that interpretation is not reasonable. *Id.; Dade v. Sherwin-Williams Co.,* 128 F.3d 1135, 1139 (7th Cir. 1997); *Halpin,* 962 F.2d at 688. Accordingly, when a plan administrator has the power to interpret the policy, courts are not permitted to substitute their interpretations of the policy terms for that of the administrator. *Booth,* 201 F.3d at 344; *Nelson v. Unum Life Ins. Co. of Am.,* 421 F. Supp. 2d 558, 566–67 (E.D.N.Y. 2006).

¶ 70. Furthermore, the majority opinion's reliance on *Pitcher* and *Casey* is misplaced because in neither *Pitcher* nor *Casey* did the court conclude that the plan administrator had the power to interpret the plan. In *Pitcher,* the court said if the plan were ambigu-

---

[10] *Id.*

[11] *Id.,* ¶ 31.

[12] *Id.,* ¶¶ 30–31.

ous, it would rely on the rule of *contra proferentum* for its decision.[13] *Pitcher,* 93 F.3d at 418. However, the court concluded there was no ambiguity. *Id.* In *Casey,* the court began its analysis by pointing out that "[t]he benefit plan does not grant discretion to the administrator to construe uncertain terms." *Casey,* 32 F.3d at 1096.

¶ 71. The differing powers of a plan administrator are critical to an ERISA analysis because when the plan administrator does not have the power to interpret the policy, the review of its interpretation is de novo.[14] *Firestone,* 489 U.S. at 115. Under a de novo standard of review, decisions of the administrator are given no

---

[13] I note that in the United States Court of Appeals for the Seventh Circuit, from which circuit *Pitcher v. Principal Mutual Life Insurance Co.,* 93 F.3d 407 (7th Cir. 1996) arises, when the administrator has the power to interpret the plan, the court defers to the administrator's decision, rather than interpreting the policy. *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 688 (7th Cir. 1992). Although the court made no express statement of the power of the administrator in *Pitcher,* the administrator could not have had the power to interpret the policy. If it had had that power, the court would have reviewed the administrator's decision to determine whether it was reasonable. *See Halpin,* 962 F.2d at 688.

[14] The framework for the analysis of a claim made under 29 U.S.C. § 1132 (a)(1)(B) of ERISA is somewhat like a chemistry flow chart. For instance, if the first question in the analysis presents choices "A" and "B" as potential answers and "A" is the answer to the first question, that answer leads to choices "C" and "D" as potential answers to the second question. If choice "B" is the answer to the first question, that answer leads to choices "E" and "F" as potential answers to the second question.

Once a court has answered "A" to the first question, it is precluded from selecting either choice "E" or "F" as an answer to the second question because answering "B" to the first question is the necessary predicate for the use of choices "E" or "F."

deference and courts may resolve ambiguities in favor of the insured. *Katzenberg v. First Fortis Life Ins. Co.*, 500 F. Supp. 2d 177, 193–94 (E.D.N.Y. 2007).

¶ 72. Furthermore, the rule of *contra proferentum* that was mentioned in *Pitcher* provides that when one party drafted the document, any ambiguities in the document are resolved against the drafter. *Nelson*, 421 F. Supp. 2d at 572. However, when the administrator has the power to interpret the policy, the rule of *contra proferentum* is inapplicable because that grant of power to the administrator permits the administrator, not the court, to interpret any ambiguous policy terms. *Halpin*, 962 F.2d at 688; *Nelson*, 421 F. Supp. 2d at 572.

¶ 73. Having established that we must apply the arbitrary and capricious standard to Touchpoint's decision denying benefits, I shall apply that standard. Touchpoint interpreted the following facts and the words in the policy to come to its conclusion that the treatment that Parker received was "experimental" as that term is defined in the policy. First, there is no

When we apply the ERISA framework for analysis to the circumstances presented by the Summers' claim, the first question is: Does the policy give the plan administrator the power to interpret the policy? Choice "A" is yes and choice "B" is no. The majority opinion correctly selects "A" (the plan administrator has the power to interpret the policy). Majority op., ¶ 17. Selecting choice "A" results in a standard of review that requires a court to affirm Touchpoint's interpretation of the policy, if it is reasonable. It is only when choice "B" is selected as the answer to the first question (i.e., the plan administrator does not have the power to interpret the policy) that a court may review the plan administrator's decision de novo and in that process interpret the policy itself. The majority opinion errs because it interprets the policy itself, when that choice is not available to it in an ERISA analysis, because the plan administrator has the power to interpret the policy.

dispute that the treatment is the subject of an ongoing Phase II clinical trial. Second, the policy defines "experimental" as:

> EXPERIMENTAL/INVESTIGATIONAL means any service, supply, drug, device, treatment, or procedure that Touchpoint Health Plan's Medical Director determines:
>
> . . . .
>
> 3. Is the subject of an on-going Phase I or II clinical trial, or furnished in connection with medical or other research to determine its maximum tolerated dose, its toxicity, its safety, or its efficacy[.]

¶ 74. The policy defines the term, "experimental," in relation to a "service, supply, drug, device, treatment, or procedure." It does not limit the definition by adding that the person seeking benefits must also be receiving such "service, supply, drug, device, treatment, or procedure" as a participant in a Phase I or II clinical trial. However, the majority opinion implies that such a limitation is a possible interpretation of the definition of "experimental."[15]

¶ 75. Touchpoint's interpretation of the policy relied on the plain language of the policy which expressly defines "experimental." The external review, conducted by the Medical Review Institute, also concluded that the treatment sought met the policy's definition of "experimental." I see nothing in the words defining "experimental" that creates an ambiguity. However, even if the policy terms could be interpreted as the majority opinion suggests, that possibility does not cause Touchpoint's interpretation to be "unreasonable." And, it is only unreasonable interpretations that are

---

[15] *Id.*, ¶ 30.

arbitrary and capricious. *Firestone*, 489 U.S. at 111; *Johnson v. Dist. 2 Marine Eng'rs Beneficial Ass'n-Associated Mar. Officers, Med. Plan*, 857 F.2d 514, 516 (9th Cir. 1988); *Cook v. Pension Plan for Salaried Employees of Cyclops Corp.*, 801 F.2d 865, 871 (6th Cir. 1986).

¶ 76. The majority opinion also asserts that Touchpoint's decision was arbitrary and capricious because "Touchpoint was inconsistent in its position on what it would cover under the terms of the plan."[16] However, the "inconsistent" "position" that the majority opinion identifies *is not an inconsistent application of the policy by the plan administrator to similarly situated applicants for benefits,* which is required before a decision may be held to be arbitrary and capricious. *Vann v. Nat'l Rural Elec. Coop. Assoc. Ret. & Sec. Program*, 978 F. Supp. 1025, 1043 (M.D. Ala. 1997).

¶ 77. As with many terms that have developed in ERISA litigation, an "inconsistent application" is a term of art that has a particularized meaning. To determine whether a plan administrator has rendered an arbitrary decision through "inconsistent application" of a policy, courts investigate "whether the challenged interpretation [of the policy] has been uniformly applied in similar situations." *DeAngelis v. Warner Lambert Co.*, 641 F. Supp. 467, 470 (S.D.N.Y. 1986) (citing *Denton v. First Nat'l Bank*, 765 F.2d 1295, 1304 (5th Cir. 1985); *Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir. 1985); *Molyneux v. Arthur Guinness & Sons, P.L.C.*, 616 F. Supp. 240, 246 (S.D.N.Y. 1985)).

¶ 78. The majority opinion does not identify the plan administrator's application of the Touchpoint policy to any other person, let alone to one who is

---

[16] *Id.*, ¶ 33.

similarly situated. Instead, the majority opinion attempts to recast both the statement by Touchpoint's attorney about how he would interpret the policy and deposition testimony of Dr. Ronald Harms, Touchpoint's Medical Director, about the differing types of chemotherapy that may or may not come within the policy as inconsistencies that indicate the denial of benefits to the Summers was an arbitrary decision.[17] However, the majority opinion's assertion that "Touchpoint maintained an arbitrary and capricious reading of its own experimental exclusion"[18] is insufficient, as a matter of law, to support the assertion that Touchpoint's denial of benefits to the Summers was arbitrary and capricious.

¶ 79. To prevail on the theory of inconsistent policy application, the Summers were required to present some evidence that the plan administrator granted benefits to other persons similarly situated to them. *See DeAngelis*, 641 F. Supp. at 470. The record and the majority opinion are silent in regard to any such applicant for, or award of, benefits.

¶ 80. In sum, under federal precedent, we must affirm Touchpoint's interpretation of the policy provisions that led to its decision to deny benefits for the high-dose chemotherapy with stem-cell rescue because Touchpoint's interpretation of the policy is reasonable.

3. Notice of denial

¶ 81. On November 19, 2002, Touchpoint denied benefits for Parker's treatment with high-dose chemotherapy and stem-cell rescue because it was not a covered service under the policy. Touchpoint's notice of denial provided in part:

---

[17] *Id.*, ¶¶ 34–35.
[18] *Id.*, ¶ 35.

Touchpoint Health Plan received a request on Parker's behalf from Dr. Diane Puccetti to consider coverage for Phase II Study of Two Alternative Intensive Induction Chemotherapy Regimens Followed by Consolidation With Myeloablative Chemotherapy and Autologous Stem Cell Rescue. The request was reviewed and it was determined that this is EXPERIMENTAL and an exclusion of coverage as stated in your CERTIFICATE OF COVERAGE.

Touchpoint *denied* coverage for the treatment for which the Summers sought both prior and subsequent approval. Touchpoint's decision was not a *termination* of benefits.

¶ 82. When there is a termination of benefits, a court may reinstate benefits pending a full review by the plan administrator of the termination decision. *Halpin,* 962 F.2d at 697. When there is a denial of benefits and the administrator's notification of the reasons for its decision is deficient, the remedy is to remand the matter to the administrator for another review of the request for payment. *Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 477–78 (7th Cir. 1998); *Halpin,* 962 F.2d at 689 (citing *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 392 (7th Cir. 1983)).

¶ 83. Notice of denial of benefits is required under 29 U.S.C. § 1133, which provides:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any partici-

pant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Federal regulations promulgated by the Secretary that relate to notice provide in relevant part:

The notification shall set forth, in a manner calculated to be understood by the claimant—

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

. . . .

(iv) A description of the plan's review procedures and the time limits applicable to such procedures[.]

29 C.F.R. § 2560.503–1(g)(1).

¶ 84. "Substantial compliance [with the applicable regulations] is sufficient" to fulfill Touchpoint's notification obligation under ERISA. *Schneider v. Sentry Group Long Term Disability Plan,* 422 F.3d 621, 627 (7th Cir. 2005) (quoting *Halpin,* 962 F.2d at 690). Substantial compliance is sufficient and technical compliance is unnecessary because the purpose of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(g) is to afford the beneficiary an explanation sufficiently adequate to enable him to mount an effective appeal, if he seeks review of the denial of benefits. *Id.* at 627–28. All that is required is a "sufficient explanation to enable" the claimant "to formulate his further challenge to the denial." *Gallo v. Amoco Corp.,* 102 F.3d 918, 923 (7th Cir. 1996).

¶ 85. Therefore, the question we must ask in regard to the notice of denial that Touchpoint provided

to the Summers is: Whether the Summers were "supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Schneider,* 422 F.3d at 628.[19]

¶ 86. The Summers sought prior authorization for the treatment of high-dose chemotherapy with stem-cell rescue that was denied for the first time on November 19, 2002. Touchpoint explained that the treatment for which the Summers sought prior authorization "falls into a Phase II clinical trial"; "experimental" is defined in the policy as including treatments subject to an ongoing Phase I or II clinical trial; and experimental treatments are excluded from coverage. The November 19 letter cited the pages of the Certifi-

---

[19] The majority opinion cites *Schneider v. Sentry Group Long Term Disability Plan,* 422 F.3d 621 (7th Cir. 2005), as support for an award of benefits. Majority op., ¶ 26. The majority's reliance on *Schneider* is misplaced for at least two reasons: First, the plan administrator in *Schneider* gave no reason for its "conclusion that [Schneider] was no longer disabled[; therefore,] she could hardly seek review of that conclusion." *Schneider,* 422 F.3d at 628. By contrast, Touchpoint explained that because the treatment was the subject of an ongoing Phase I or II clinical trial, it met the definition of "experimental" under the policy, and experimental treatments are not covered. Second, *Schneider* involved the *termination* of benefits. When an ERISA procedural decision is erroneously made, courts reinstate the status quo. *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 776 (7th Cir. 2003). The status quo for erroneous *termination* is to reinstate benefits. *Id.* By contrast, if benefits were *denied* due to a procedural error, the correct procedure is to "remand[] to the administrator for a new hearing." *Schneider,* 422 F.3d at 629 (citing *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 393–94 (7th Cir. 1983)). The Summers were *denied* benefits.

cate of Coverage containing the exclusions from coverage and the definition for "experimental." It explained the appeals procedure, as well as the Summers' opportunity for an external review.

¶ 87. The Summers chose an external review. On November 25, 2002, the Medical Review Institute, the external review body, also concluded that the treatment was not covered under the policy because it was experimental. The Summers re-submitted their claim to Touchpoint for the same treatment after Parker had received it. On December 12, 2002, Touchpoint again denied the claim because it was a request for "cycle two of the Phase II clinical trial for treatment of anaplastic ependymoma." Therefore, between November 19, 2002 and December 12, 2002, the Summers received three notices that their claim for high-dose chemotherapy with stem-cell rescue was not a covered service under their policy because it was defined as "experimental" by the policy.

¶ 88. All three notices must be read together when determining whether Touchpoint substantially complied with its notice obligations under federal law because the notices applied to the same treatment and all were received within one month's time.

¶ 89. Furthermore, the Summers have never asserted that they did not understand Touchpoint's reason for denying their claim for coverage. The complaint they filed to commence this action demonstrates that they understood why their claim was denied. The complaint asserts that the requested treatment is the subject of a Phase II study at New York University Medical Center. Complaint, ¶ 9. The Summers understood that their claim was denied because the treatment fell within a Phase II clinical trial and was therefore experimental and excluded under the terms of

the policy. Complaint, ¶ 11. Accordingly, I must conclude that the purpose of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(g) was fulfilled.

¶ 90. The basis for the Summers' claim seems to be that because their pediatric oncologist recommended high-dose chemotherapy with stem-cell rescue as the best of the available treatments for Parker, that treatment should be covered by their policy. Complaint, ¶ 10. However, a faithful application of the law to the healthcare policy does not permit the conferral of benefits for that reason. Rather, the terms of the policy must be followed. *Egelhoff*, 532 U.S. at 147. Because the Summers have a sufficiently clear understanding of Touchpoint's reason for the denial of benefits to permit an effective review, I conclude that Touchpoint substantially complied with the notice requirements under federal law.

¶ 91. Notwithstanding the evidence of the Summers' understanding of the reason Touchpoint denied coverage, the majority opinion concludes that Touchpoint's notice was insufficient.[20] It then seeks a way to base payment for Parker's treatment on that perceived deficiency.[21] It relies heavily on *Evans v. W.E.A. Insurance Trust,* 122 Wis. 2d 1, 361 N.W.2d 630 (1985).

¶ 92. *Evans* involved the application of "guidelines" that a claims manager created to evaluate claims for benefits for gastric bypass surgery. *Id.* at 7. The claim for benefits was denied based on the guidelines. *Id.* at 12–13. We concluded that the denial of benefits was arbitrary and capricious because the guidelines "impose[d] a standard for payment of benefits that is

---

[20] Majority op., ¶ 25.
[21] *Id.*, ¶¶ 43–48.

not required by the basic plan, but rather is imposed by an administrative gloss." *Id.* at 15–16. *Evans* has no application to the case at hand because Touchpoint interpreted the words of the policy, not "guidelines" that were inconsistent with the policy, as the claims manager did in *Evans*.

¶ 93. The majority opinion agrees that Touchpoint has the power to interpret the policy.[22] However, after citing appropriate federal case law that supports this conclusion, the majority opinion recasts the policy as a termination of benefits: "The policy grants Touchpoint's medical director the discretion *to terminate* coverage if treatments are experimental or investigational."[23] The majority opinion recasts the power Touchpoint was granted under the policy as the power to "terminate" coverage so that later it can assert, "the appropriate issue in this case is whether Touchpoint's *termination* of benefits was arbitrary and capricious."[24]

¶ 94. Touchpoint did not "terminate" payments for high-dose chemotherapy and stem-cell rescue. No payments have ever been made. Instead, Touchpoint denied payment for high-dose chemotherapy and stem-cell rescue because that treatment was not a covered service under the policy. The Summers' complaint clearly shows that they understood their claim was *denied:*

> Defendant sent a letter to plaintiffs *denying coverage* for Parker's participation in Dr. Findlay's study as proposed by Dr. Puccetti on the grounds that "the request [fell] into a Phase II clinical trial," and was

---

[22] *Id.*, ¶ 17.

[23] *Id.* (emphasis added).

[24] *Id.*

therefore "experimental" and excluded under the terms and provisions of the policy's Certificate of Coverage.

Complaint, ¶ 11 (emphasis added).

¶ 95. Under federal law, Touchpoint is prohibited from paying for services unless the services are covered under the policy. *Egelhoff,* 532 U.S. at 147. The policy does not permit payment for treatments that are the subject of a Phase I or II clinical trial. There is no dispute that the treatment Parker received is the subject of a Phase I or II clinical trial. Therefore, Touchpoint could not "terminate" what it could not have awarded in the first instance. *Id.* Stated otherwise, Touchpoint is not free to pay for any service that is requested by a participant or ordered by a physician. It has the power to pay for only those services that are covered by the policy. *Id.*

¶ 96. In my view, the majority opinion recasts Touchpoint's denial of benefits into a "termination" of benefits because it chose to order payment for the treatment that Parker received. Stated otherwise, if the majority opinion acknowledged that Touchpoint's decision was a denial of benefits, it would have to explain how a treatment that is indisputably the subject of a Phase I or II clinical trial is a covered service, before payment for that treatment could be ordered.[25]

## III. CONCLUSION

¶ 97. I conclude that, because Touchpoint has the power to interpret and apply the policy, we are required to uphold the plan administrator's interpretation and application of the policy if it is reasonable. *Firestone,* 489 U.S. at 111. Touchpoint decided that the treatment

---

[25] *Id.,* ¶¶ 42–43.

for which benefits were sought is defined as an "experimental" treatment in the policy and that "experimental" treatments are excluded from coverage under the policy. This is a reasonable interpretation of the policy; and therefore, it is not arbitrary and capricious. I also conclude that the notice of denial of claim substantially complied with the notice requirements of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(g).

¶ 98. Accordingly, I would reverse the court of appeals and remand the case to the circuit court to dismiss the Summers' complaint on the merits. Therefore, I respectfully dissent from the majority opinion.

¶ 99. I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.